THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NELSON COLEMAN, Defendant-Appellant.

Fourth District No. 4—89—0800

Opinion filed November 8, 1990.

568

[black redaction bars]

C. Steve Ferguson, of Harlan Heller, Ltd., of Mattoon, for appellant.

Nancy Owen, State's Attorney, of Charleston (Kenneth R. Boyle, Robert J. Biderman, and James Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

On August 1, 1989, defendant Nelson Coleman was found guilty by a jury sitting in the circuit court of Coles County of committing the offense of aggravated criminal sexual assault in violation of section 12—14(b)(1) of the Criminal Code of 1961 (Criminal Code) (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(b)(1)). Defendant was subsequently found eligible for an extended-term sentence and was sentenced to 35 years' imprisonment with the Illinois Department of Corrections. Defendant now appeals.

Defendant was charged by information on March 29, 1989, with committing the offense of aggravated criminal sexual assault. The information alleged that defendant was in excess of 17 years of age, and that he committed several acts of sexual penetration with C.S., who was under 13 years of age at the time. In fact, C.S., defendant's stepdaughter, was five years old at the time of the offense. The jury trial commenced on July 26, 1989.

The State called Dr. James Monteleone and Nurse Tish LaRock, who are employed by St. Louis University at Cardinal Glennon Hospital for children. Since 1980, Dr. Monteleone has been chairman of the child abuse and neglect team and the sexual abuse management team at the hospital. LaRock has worked on Dr. Monteleone's teams for the last five years. Dr. Monteleone has seen over 6,000 abused children. Within the last year, he has seen 1,300, with 450 of those having been sexually abused. He estimates that over the last four years he has examined over 2,000 sexually abused children. He is board certified in pediatrics and pediatric endocrinology.

On March 1, 1989, C.S. was brought to the hospital, with LaRock taking the case history from Department of Children and Family Services (DCFS) worker Maria Miller. Dr. Monteleone then examined C.S. He explained that his examination showed that she had scarring in the vagina just outside the hymen. She also had some knots on the hymen that can be due to irritation and to abuse.

He then examined her anus. He explained that children who have been sexually abused often have an anus that will gape open, which C.S.'s did in this case. She also had a cupping of some tissue from inside the anus.

Dr. Monteleone and Nurse LaRock explained there are certain behavioral characteristics of children who have been sexually abused. These include (1) abnormal fears, including nightmares; (2) acting out sexually with dolls or other children; (3) precocious sexual knowledge and the ability to relate explicit sexual behavior; (4) excessive masturbation; and (5) regressive behavior, including bed-wetting.

Dr. Monteleone explained there are three aspects to evaluating an allegation of sexual abuse. The first is what the child says. The second is the behavioral indicators. The third is the physical findings. It was his opinion that the injuries to the vagina and anus were caused by sexual abuse. He acknowledged that the knots on the hymen are nonspecific in that they do not require a finding of sexual abuse by themselves, and that the anal findings are consistent with the passage of large stools. However, he did not believe this was very likely. He did clarify that the vaginal scar was pretty specific for sexual abuse. It was his opinion, based on all the factors, that C.S. had been sexually abused. LaRock expressed a similar opinion.

Mary Anna Ludington has been employed as a child and family therapist with the Human Resources Center of Clark and Edgar Counties for 11 years. She has a master's degree and approximately 119 hours of continuing education credits. She has counseled with approximately 70 sexually abused children since 1980 and became C.S.'s therapist on February 28, 1989, seeing her 16 times since then.

She explained that of the children she has observed who are sexually abused, many had similar characteristics. These are (1) sleep disturbances and nightmares, (2) bed-wetting, (3) regressive behavior, (4) being fearful and clinging to certain people, (5) making sexual comments that a child that age would not usually know, (6) being overly sexualized, (7) tantrums and sudden mood swings, (8) acting out sexually with other children and with their toys, including excessive masturbation, and (9) complaints of pain in the vaginal or anal areas. She explained she found several of these characteristics in C.S. For exam-

ple, C.S. gave explicit details of sexual acts, including physical sensations and emotional feelings. She was preoccupied in the pictures she drew and in her thoughts with genitals and sex. She acted out sexually with other children and with her toys. Her moods would abruptly swing from one to another. She complained about discomfort in the vaginal and anal area. She had trouble sleeping, and she had nightmares. Ludington explained that in her opinion there was no situation she could think of as an explanation for C.S.'s behavior, other than that she had been sexually abused.

On cross-examination, Ludington acknowledged that sleep problems and clinging to adults can occur due to a foster placement, and that minor mood swings would be expected. However, she did not believe these would occur to the degree she saw in C.S. She observed that C.S. enjoyed seeing other people in trouble and that she would at times provoke fights with the other children. C.S. also expressed that she was continually subject to unfair treatment.

Sally Cox became foster mother to C.S. and her sisters about 10 months prior to this time. She had observed that C.S. was overly affectionate. For example, C.S. goes up to strangers and will climb up in their laps and start giving them kisses. One day, she took a doll and spread its legs out and pretended to have oral sex with it. Another time, during a bath, she put a finger in her sister's vagina. She has also had a problem with bed-wetting. Cox's daughter also testified to the incident where C.S. put her hand on her sister's vagina.

The next witness was the victim, C.S., who was age six at the time of the trial. She stated that at one time she lived with her mother and with defendant in Mattoon. She remembers talking to Maria Miller about defendant. She said she understood the difference between a "good touch" and a "bad touch." She explained a "good touch" is giving a hug.

She then stated that defendant had given her a "bad touch." She stated this happened more than once. At that point, C.S. froze up and would answer no other questions. The court took a recess and attempted to speak with C.S. It appears during the court's questioning and on cross-examination that she would respond to general questions by either shaking or nodding her head. However, the record indicates she would give no response whatsoever concerning the incidents. C.S. was excused as a witness.

Maria Miller has been employed as an investigator for DCFS since January 1986. Since that time, she has conducted over 400 child-abuse and -neglect reports, of which approximately 130 dealt with sexual abuse. DCFS has given her special training in the field of sexual

abuse. During these years, she has interviewed 500 to 600 children.

Miller testified that on January 13, 1989, she responded to the Sally Cox residence to investigate a report involving C.S. She was with Illinois State Police investigator Collin McClain. After ascertaining that C.S. knew the difference between right and wrong and the truth and a lie, Miller asked her about any sexual abuse. The court had earlier entered an order prohibiting Miller from identifying the person that C.S. said gave her the bad touch, other than by the generic "he." Miller stated that C.S. told her that he had touched her between her legs with his hand; he had placed his finger in her private part; and, after he placed his finger there, he took it out and put his finger in his mouth. C.S. stated very clearly that when someone touches you there it feels "yucky" and it tastes "yucky." C.S. told Miller that this has happened more than once. C.S. also stated that he wanted her to touch his "thing" with her hand and she did that. When she did that, the "pee" came out and it was peach-colored. C.S. said he also touched her butt with his hand.

Miller then asked C.S. to demonstrate with the anatomically correct dolls. C.S. took the child doll, which she identified as herself, and took the adult male doll, which she identified as the perpetrator. She then took the fingers of the male doll, bending a couple of them back, and put the remaining fingers in the vagina of the child doll. She then took the fingers of the doll and put them in her own mouth and said that is what happened between the two of them. She then placed the adult male doll on top of her and said he touched her with his hand in her butt.

The State's next witness was Dr. Jerry Boyd, a clinical psychologist in private practice. He stated that over the years he has counseled 500 to 800 sexually abused children. He also identified the behavior characteristics of sexually abused children. In response to a hypothetical question including the facts the State had presented, Dr. Boyd stated the behavior of the child would be consistent with a child who had been sexually abused. He found the physical evidence and the knowledge of sexual behavior on the part of the child particularly relevant. He also explained that testifying can be a traumatic experience for a six year old.

On cross-examination, Dr. Boyd testified that several of the psychological indicators are nonspecific to a sexually abused child. He also stated it was his opinion that if a six-year-old girl of average intelligence was exposed to books containing pictures portraying sexual behavior, the child would be able to describe that behavior in age-appropriate language. The State rested at this point.

Defendant's first witness was Pat Stuart, C.S.'s grandmother. She testified that during the time in question she and C.S.'s family lived in a duplex home. She lived in one apartment, and C.S.'s family lived in the other apartment. She described C.S. as a mischievous child who likes to be the center of attention. She also explained she had a good relationship with C.S., and C.S. never complained about defendant doing anything inappropriate to her. Also, C.S. has always had a bed-wetting problem.

Carrie Cummins is a friend of the family, and she has been in the household at various times. She has observed defendant with the children, and it is her opinion that it is a loving-type relationship. During all her visits there, she never saw defendant touch C.S. or any of the other girls in an inappropriate fashion. She is very close to C.S., and C.S. never told her that defendant touched her in an inappropriate manner. She observed that C.S. is very creative in making up stories.

At this point, the parties entered into a stipulation as to the testimony of Gail Steidl, who is a caseworker for DCFS. Her stipulation would be that she has monitored the visitation between defendant and the children since 1988. Defendant and the children display appropriate hugging, kissing, and exchanging of affection.

Defendant's next witness is Shelly Coleman, mother of C.S. and wife of defendant. She explained that she has known defendant since 1978. They have two children. One is Nichole and the other is Elizabeth. She also has two other children, Patricia and C.S. Nichole is the oldest, followed by Patricia, C.S., and then Elizabeth. In 1987, after he was discharged from the military, she married defendant.

She described C.S. as being very active and tomboyish. C.S. liked to climb trees and, in fact, would slip and fall down on the branch in a straddle position. The few times C.S. did that, she would complain of pain afterward. C.S. also had a Hot Wheels, which she liked to ride down an incline and run into a wall. She did that several times and then began complaining of pain in her pelvic area.

She stated that C.S. was potty trained for day, but that she continually wet the bed at night. During the latter part of the summer of 1988, C.S. developed a condition of constipation. When C.S. finally had a bowel movement, she would complain about the pain. Eventually she took C.S. to a Dr. Dutta in Charleston. Dr. Dutta performed a pelvic exam on C.S. Coleman testified that Dutta was very rough when he completed these exams. She also stated that he did a rectal exam by placing his finger in her anus. Eventually, he gave them some suppositories to ease the constipation.

She stated that Gary and Joy Bernard were friends of the family.

The families visited together often. The Bernards have a son named Hubert, age six. During the summer of 1988, C.S. and Hubie were caught in three sexual incidents. Coleman observed that Hubie had a lewd vocabulary and seemed to know sexual matters beyond his age. One of these times, C.S. said Hubie had his finger in her.

Coleman explained that after these incidents C.S. seemed more interested in sexual matters. She began getting into some sexual manuals that they had. These manuals had pictures portraying people in different sexual positions and engaging in different sexual activities. On at least two occasions, she caught C.S. with these books. She also explained that C.S. has a habit of making up stories. When she is confronted with having done something wrong, she will either deny it or not say anything.

Gary Bernard testified similarly to the incidents between Hubie and C.S. He also stated that Hubie had gotten into trouble at school for grabbing girls about his age somewhere where he should not.

Defendant described C.S. as being a tomboy and wanting to roughhouse. He stated he has previously seen C.S. get very quiet, as when she was trying to testify. That is when she has been caught in a story or when she does not wish to admit doing something. He denied ever committing any of the sexual acts with C.S. The defense rested.

Once deliberation started, the jury requested transcripts of the testimony of Miller and C.S. After discussions, the court, over defendant's objection, granted the request and had the transcripts prepared for the jury. The jury returned with the guilty verdict.

The sentencing hearing was conducted on September 11, 1989. The court, finding defendant eligible for an extended-term sentence pursuant to section 5—5—3.2 of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2), imposed a sentence of 35 years. This appeal followed.

Prior to trial, defendant made a motion to dismiss the charge, alleging that his due process rights were violated by his being charged with the offense of aggravated criminal sexual assault. (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(b)(1).) He renews this argument now.

■ Defendant observes that section 12—13(a)(3) of the Criminal Code defines the offense of criminal sexual assault as occurring when an act of sexual penetration is committed on a victim under 18 years of age by a family member. (Ill. Rev. Stat. 1989, ch. 38, par. 12—13(a)(3).) Defendant qualifies as a family member. (See Ill. Rev. Stat. 1989, ch. 38, par. 12—12.) This offense is a Class 1 felony. (Ill. Rev. Stat. 1989, ch. 38, par. 12—13(b).) He further observes the crime with which he is charged occurs when an act of sexual penetration is com-

mitted by someone 17 years of age or older and the victim is under age 13. This offense is a Class X felony. (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(d).) He believes that since specific statutes will prevail over general ones (see 34 Ill. L. & Prac. *Statutes* §133 (1958)), he should have been more properly charged with the section 12—13 offense since he more particularly fits that offense.

■■■ Our supreme court has repeatedly held that the State's Attorney has a responsibility for evaluating the evidence and other pertinent factors in determining what offense can and should properly be charged. (*People v. Rhodes* (1967), 38 Ill. 2d 389, 396, 231 N.E.2d 400, 403; *People v. Keegan* (1971), 52 Ill. 2d 147, 153, 286 N.E.2d 345, 348; *People v. McCollough* (1974), 57 Ill. 2d 440, 444, 313 N.E.2d 462, 464; *People v. Brooks* (1976), 65 Ill. 2d 343, 349, 357 N.E.2d 1169, 1172.) The court has also repeatedly denied arguments that question the "unguided discretion" of the prosecutor in charging a felony or misdemeanor, where the alleged conduct comprises either offense. (*Keegan*, 52 Ill. 2d at 153, 286 N.E.2d at 348; *McCollough*, 57 Ill. 2d at 444, 313 N.E.2d at 464; *Brooks*, 65 Ill. 2d at 349, 357 N.E.2d at 1172.) In *Brooks*, the court addressed the question of whether a specific statute with a lesser penalty required the defendant to be charged with that rather than with a violation of a general statute. The court concluded that when a defendant's act has violated more than one statute, and each statute requires different proof for conviction, even though there may be some overlapping, the defendant may be prosecuted under the statute which provides the greater penalty. (*Brooks*, 65 Ill. 2d at 347, 357 N.E.2d at 1171; see also *People v. Gordon* (1976), 64 Ill. 2d 166, 170, 355 N.E.2d 3, 6.) Here, it is clear the two sections in question have some different elements. Thus, the determination of which offense to charge was properly placed in the State's Attorney's discretion, and there is no error.

■■ Defendant next contends he was not proved guilty beyond a reasonable doubt. The standard of review in cases of this nature used to be that the victim's testimony must be either clear and convincing or corroborated. (See *People v. Server* (1986), 148 Ill. App. 3d 888, 499 N.E.2d 1019.) However, this court has recently concluded that now conventional reasonable-doubt analysis should control. See *People v. James* (1990), 200 Ill. App. 3d 380, 394, 558 N.E.2d 732, 741; *People v. Roy* (1990), 201 Ill. App. 3d 166, 185, 558 N.E.2d 1208, 1221.

■■ A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt. (*People v. Vriner* (1978), 74 Ill. 2d 329, 342, 385 N.E.2d 671, 676.) When presented with a challenge to the sufficiency

of the evidence, it is not the function of this court to retry the defendant. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.) Once the defendant has been found guilty of the charged crime, the fact finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277.) The relevant question is whether, if after viewing the evidence in such a fashion, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789; *Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277.

■■ ■ In the present case, we find the evidence sufficient. C.S. identified defendant as the person who gave her the "bad touch." When she refused to testify further, Miller's testimony filled in the details of the assaults and included C.S.'s conduct with the dolls, which corroborated this testimony. Medical testimony establishes that C.S. was sexually abused, and it was the opinion of all the experts that C.S. showed the behavior of a sexually abused child.

Defendant, of course, denied this conduct occurred. He also tried to blame C.S.'s precocious sexual knowledge and the evidence of the sexual abuse on the incidents between C.S. and Hubie. However, the jury was not required to accept the defendant's testimony. Similarly, the jury could have reasonably concluded that C.S. gained this particular knowledge from her incidents with defendant and was merely acting out in her conduct with Hubie. The questions of the credibility of witnesses and the resolution of evidentiary conflicts are for the trier of fact. (*Collins*, 106 Ill. 2d at 261-62, 478 N.E.2d at 277.) After considering all the evidence in the proper light, we conclude the jury could have properly found defendant guilty.

Defendant next contends the court improperly restricted his right of cross-examination. After the close of the State's case, defendant sought to recall Miller to testify concerning the videotaping of the victim taken on January 18, 1989, five days after the original interview to which Miller testified. Defendant maintained C.S. made statements in that interview which were inconsistent with the earlier interview, and that these inconsistencies are admissible to attack the credibility of the first interview. The State objected. Miller testified outside the presence of the jury so the court could determine its admissibility. The court concluded the evidence would only confuse the jury and, accordingly, refused to allow this testimony.

■■ As a general rule, the latitude to be allowed in cross-examination of witnesses rests largely in the discretion of the trial court. (*People v. Peter* (1973), 55 Ill. 2d 443, 451, 303 N.E.2d 398, 404; *People v. Gallo* (1973), 54 Ill. 2d 343, 356, 297 N.E.2d 569, 576.) Such cross-examination should be kept within fair and reasonable limits, and it is only in a case of clear abuse of discretion, resulting in manifest prejudice to the defendant, that a reviewing court will interfere. *Peter*, 55 Ill. 2d at 451-52, 303 N.E.2d at 404; *Gallo*, 54 Ill. 2d at 356, 297 N.E.2d at 576.

■■ We find that the court did improperly restrict the testimony. The evidence shows that during this second interview C.S., at one point, indicated no one touched her "wiener," and later stated a person other than defendant touched her. This evidence could clearly have an impact on what weight the jury might give the earlier hearsay statement. Since C.S. is, in essence, allowed to testify through her earlier out-of-court statement, it is only appropriate that "impeachment" of this "testimony" by other out-of-court statements she made which are inconsistent be admissible. Of course, as the trial court indicated, once defendant is allowed to show inconsistencies in the subsequent statement, the State is allowed to present evidence of the rest of the statement to show that it is not, in fact, inconsistent. However, the determination of whether it is inconsistent, what weight to give it, and how it would impact the earlier statement are all appropriately left to the trier of fact. Here, we find this restriction did manifestly prejudice defendant, and we must therefore reverse the conviction and remand for a new trial.

Defendant raises numerous other allegations of error. However, most we will not now need to consider. We will address those issues which are likely to recur at the retrial.

Defendant argues next that the court erred by allowing Miller to testify to the content of the January 13, 1989, interview she conducted with C.S. Following a hearing, the court allowed the testimony pursuant to section 115—10 of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 115—10). Defendant believes this violated his right of confrontation.

■■ Section 115—10(a)(2) of the Code provides that for any prosecution of a sexual offense committed on a child under age 13, the testimony of an out-of-court statement made by the child, describing any complaint of such an act or matter or detail pertaining to any act which is an element of the charged offense, is admissible as an exception to the hearsay rule. (Ill. Rev. Stat. 1989, ch. 38, par. 115—10(a)(2).) Parenthetically, we observe the trial court limited Miller's

testimony by not allowing her to relate who C.S. identified as the offender. This was a good-faith attempt by the court to reconcile this court's holdings under the pre-1988 version of section 115—10 with the present version. However, we have now made clear that, under the present version, evidence of all the details, including the offender's identity, are admissible once the initial requirements are met. *People v. Morton* (1989), 188 Ill. App. 3d 95, 100-03, 543 N.E.2d 1366, 1370-71; see also *People v. Rushing* (1989), 192 Ill. App. 3d 444, 450-52, 548 N.E.2d 788, 792-93; *People v. Rocha* (1989), 191 Ill. App. 3d 529, 536, 547 N.E.2d 1335, 1339.

██ The requirements for admission of this testimony are included in section 115—10(b), which provides:

"Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child either:

(A) Testifies at the proceeding; or

· (B) Is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement." Ill. Rev. Stat. 1989, ch. 38, par. 115—10(b).

Defendant believes this section, as written and as applied to him, effectively denied his confrontation rights since he was unable to cross-examine C.S. In *Rocha*, the Second District Appellate Court, after an exhaustive analysis, concluded that no such problem existed. In *Roy*, this court reached a similar conclusion. However, subsequent to those decisions and oral arguments in the present case, the United States Supreme Court issued a more definitive statement on the interplay between the confrontation clause and hearsay testimony of child sexual-abuse victims in *Idaho v. Wright* (1990), 497 U.S. ___, 111 L. Ed. 2d 638, 110 S. Ct. 3139. It is to this case we must turn to answer defendant's question.

The *Wright* case involved the hearsay testimony of a 2½-year-old victim who had been found incompetent to testify. The trial court allowed this evidence pursuant to the Idaho residual hearsay exception. The Idaho Supreme Court found the testimony inadmissible as violating the confrontation clause, with the United States Supreme Court affirming that decision.

In making its analysis, the Supreme Court observed that in *Ohio v. Roberts* (1980), 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531, it had previously set forth "a general approach" for determining when incriminating statements admissible under an exception to the hear-

say rule also meet the requirements of the confrontation clause. (*Wright*, 497 U.S. at ____, 111 L. Ed. 2d at 651, 110 S. Ct. at 3146.) This approach was as follows: first, in the usual case, the prosecution must either produce or demonstrate the unavailability of the witness; second, once a witness is shown unavailable, his statement is admissible only if it bears adequate "indicia of reliability." *Wright*, 497 U.S. at ____, 111 L. Ed. 2d at 651-52, 110 S. Ct. at 3146; *Roberts*, 448 U.S. at 65-66, 65 L. Ed. 2d at 607, 100 S. Ct. at 2539.

The Court then observed that the "indicia of reliability" standard can be met in two ways. The first is where the statement falls within a firmly rooted hearsay exception, and the second is where the statement is supported by "a showing of particularized guarantees of trustworthiness." (*Wright*, 497 U.S. at ____, 111 L. Ed. 2d at 653, 110 S. Ct. at 3147; *Roberts*, 448 U.S. at 66, 65 L. Ed. 2d at 608, 100 S. Ct. at 2539.) The court, observing the case before it did not fall into the first test, then explained how the second determination is to be made.

■■ The Court concluded that the " 'particularized guarantees of trustworthiness' must be shown from the totality of the circumstances, but we think the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief." (*Wright*, 497 U.S. at ____, 111 L. Ed. 2d at 655, 110 S. Ct. at 3148.) This test is based on the belief that evidence admissible under this exception must be, just as it is for firmly rooted hearsay exceptions, "so trustworthy that adversarial testing would add little to its reliability." (*Wright*, 497 U.S at ____, 111 L. Ed. 2d at 656, 110 S. Ct. at 3149.) The Court specifically held that this determination is to be made without the use of other evidence which may corroborate the statement. *Wright*, 497 U.S. at ____, 111 L. Ed. 2d at 657, 110 S. Ct. at 3150.

The Court identified a number of factors which relate to whether hearsay statements made by child witnesses in child sex-abuse cases are reliable. These include spontaneity and consistent repetition, mental state of declarant, use of terminology unexpected of a child of similar age, and lack of motive to fabricate. (*Wright*, 497 U.S. at ____, 111 L. Ed. 2d at 656, 110 S. Ct. at 3150.) However, the Court further explained:

> "These factors are, of course, not exclusive, and courts have considerable leeway in their consideration of appropriate factors. We therefore decline to endorse a mechanical test for determining 'particularized guarantees of trustworthiness' under the Clause. Rather, the unifying principle is that these factors

relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." (*Wright*, 497 U.S. at ___, 111 L. Ed. 2d at 656, 110 S. Ct. at 3150.) The Court also observed that, while it would not require procedural safeguards such as videotaping of the interview, such procedural safeguards may well enhance the reliability of out-of-court statements of children regarding sexual abuse. (*Wright*, 497 U.S. at ___, 111 L. Ed. 2d at 654, 110 S. Ct. at 3148.) Ultimately, the Court concluded in *Wright* that the statements were inadmissible.

In applying this analytical framework to the case now before us, we must first turn to the question of the unavailability of the witness. In *Roberts*, as noted, the Court indicated that in the "usual" case this was a prerequisite. However, subsequent Supreme Court decisions have indicated that it is not always a requirement (see *United States v. Inadi* (1986), 475 U.S. 387, 89 L. Ed. 2d 390, 106 S. Ct. 1121; *Bourjaily v. United States* (1987), 483 U.S. 171, 97 L. Ed. 2d 144, 107 S. Ct. 2775), and, in fact, have suggested that in this regard *Roberts* was limited to the facts it addressed (*Inadi*, 475 U.S. at 392-93, 89 L. Ed. 2d at 397, 106 S. Ct. at 1125). *Roberts* itself, in a footnote, suggests that a showing of strict unavailability is not always necessary. (See *Roberts*, 448 U.S. at 65 n.7, 65 L. Ed. 2d at 607 n.7, 100 S. Ct. at 2538 n.7.) Thus, this court has concluded that the unavailability of a witness is not a prerequisite in every case for compliance with the confrontation clause. (See *People v. White* (1990), 198 Ill. App. 3d 641, 656-64, 555 N.E.2d 1241, 1251-56; *Roy*, 201 Ill. App. 3d at 184, 558 N.E.2d at 1220-21.) To what extent the *Wright* opinion, by its strong reliance on *Roberts* and the analysis contained therein, reinvigorates the requirement that the witness is unavailable is unclear since the Court stated:

"Applying the Roberts approach to this case, we first note that this case does not raise the question whether, before a child's out-of-court statements are admitted, the Confrontation Clause requires the prosecution to show that a child witness is unavailable at trial—and, if so, what that showing requires. *** For purposes of deciding this case, we assume without deciding that, to the extent the unavailability requirement applies in this case, the younger daughter was an unavailable witness within the meaning of the Confrontation Clause." *Wright*, 497 U.S. at ___, 111 L. Ed. 2d at 652, 110 S. Ct. at 3147.

■■■ Fortunately, we also do not need to answer this question because we find that under the facts of this case C.S. should properly be considered an unavailable witness. In *Rocha*, the court specifically ad-

dressed the unavailability requirement of section 115—10(b)(2)(B). After a long analysis and reference to decisions of other jurisdictions, the court concluded:

"The legislature, then, has provided section 115—10 as a mechanism for allowing into evidence the out-of-court statements of children who are the victims of sexual abuse. This court holds that the legislature's intent was to include within the meaning of 'unavailable' witnesses those children who are unable to testify because of fear, inability to communicate in the courtroom setting, or incompetence." (*Rocha*, 191 Ill. App. 3d at 539, 547 N.E.2d at 1341-42.)

A similar conclusion as to when a child witness becomes "unavailable" has been reached by the Federal courts (see, *e.g.*, *Gregory v. North Carolina* (4th Cir. 1990), 900 F.2d 705 (and cases cited therein)), and in the State courts (see, *e.g.*, *State v. Jones* (1989), 112 Wash. 2d 488, 772 P.2d 496; *State v. Chandler* (1989), 324 N.C. 172, 376 S.E.2d 728; *State v. Drusch* (1987), 139 Wis. 2d 312, 407 N.W.2d 328). We find the analysis in *Rocha* persuasive and adopt its conclusion as our own.

 It is clear in the present case that C.S. ceased testifying due to her fears and, despite the best efforts of the court, she would not proceed, which is entirely understandable considering her tender years and the circumstances. We find that under these circumstances she is properly considered unavailable for the purposes of section 115—10. The fact she testified for a short time prior to stopping does not change that conclusion. (See *Chandler*, 324 N.C. 172, 376 S.E.2d 728.) Once a child witness is unable to proceed with his or her testimony, whether that point occurred prior to taking the stand or subsequently, he or she is properly considered unavailable. Thus, to whatever extent the unavailability of the witness is a prerequisite to the statement's admission, that burden has been met.

This takes us to the second prong of the *Roberts* analysis, and that is whether the statement contained sufficient "indicia of reliability." Since the hearsay exception contained in section 115—10 is not a firmly rooted hearsay exception (*Rocha*, 191 Ill. App. 3d at 541, 547 N.E.2d at 1342; *Roy*, 201 Ill. App. 3d at 184, 558 N.E.2d at 1220), the statement must show a particular guarantee of trustworthiness to be admissible.

 Section 115—10(b)(1) provides that, prior to the evidence being found admissible, a hearing should be conducted, and the court must find that "the time, content, and circumstances of the statement provide sufficient safeguards of reliability." (Ill. Rev. Stat. 1989, ch.

38, par. 115—10(b)(1).) By providing for such a hearing, our statute has been held to comply with the confrontation clause's required showing of particular guarantees of trustworthiness. (*Rocha*, 191 Ill. App. 3d at 541, 547 N.E.2d at 1342.) However, as noted, *Wright* has more particularly indicated what is needed to meet this requirement. Accordingly, it is necessary to construe the general language of section 115—10(b)(1) to be in line with the more particular language of *Wright*. Thus, the required finding that the statement provides "sufficient safeguards of reliability" must be understood to be of a comparable nature with a finding that the circumstances of the statement render the declarant "particularly worthy of belief" and, in reaching this decision, the court must consider only those circumstances which surround the making of the statement.

In the present case, the court conducted a hearing outside the presence of the jury in which Miller testified. The court, reciting the statutory language, found the statement admissible. *Wright* has now given greater definition to the required hearing and the finding necessary to allow admission of the evidence. Accordingly, it is necessary upon remand for the court to conduct a hearing and make a determination in accordance with *Wright*. If the court determines that the statement shows the particular guarantees of trustworthiness, then the statement is properly admissible. If it does not, then the statement is inadmissible.

Defendant next raises various objections to the testimony of Dr. Monteleone, Nurse LaRock, and therapist Ludington concerning the characteristics of child sex-abuse victims and whether C.S., in their opinions, had been sexually abused.

Expert testimony will be admitted if the expert has some knowledge or experience which will aid the court or jury in arriving at determinations on the issues and if the subject matter is sufficiently beyond the common experience. (*Server*, 148 Ill. App. 3d at 897, 499 N.E.2d at 1025-26.) The indicia of expertise is not a given level of academic qualifications, but whether the expert has knowledge and experience beyond the average citizen which would assist the jury in evaluating the evidence. (*People v. Douglas* (1989), 183 Ill. App. 3d 241, 254, 538 N.E.2d 1335, 1343.) Irrespective of how specialized knowledge was acquired, whether through education, training, experience, or a combination of each, if the witness possesses such knowledge, he may testify. (*Douglas*, 183 Ill. App. 3d at 254, 538 N.E.2d at 1343.) This determination is directed to the sound discretion of the trial court and will only be disturbed when it constitutes an abuse of that discretion. *People v. Bradley* (1988), 172 Ill. App. 3d

545, 550, 526 N.E.2d 916, 920.

 In the present case, due to combinations of education and experience, it is evident all three witnesses qualify as experts. It is also apparent that the behavior of children who have been sexually abused is beyond the knowledge of the common layman and that this information would be of benefit to the jury. Accordingly, we find no error with its admission.

 Defendant further argues, incorrectly, that it was improper for Dr. Monteleone to rely on the relevant history of C.S. as related to him by LaRock, who received it from Miller, in expressing his opinion that C.S. was sexually abused. In *J.L. Simmons Co. ex rel. Hartford Insurance Group v. Firestone Tire & Rubber Co.* (1985), 108 Ill. 2d 106, 116-17, 483 N.E.2d 273, 278, the court stated:

"Firestone also contends that the expert testimony of Richard Bliss, a vocational counselor, was improperly admitted. It maintains that Bliss' testimony and opinions were all based on hearsay evidence derived from Boone during interviews conducted by Bliss. Based upon this court's opinion in *Wilson v. Clark* (1981), 84 Ill. 2d 186, the appellate court concluded that the testimony was properly admitted. We agree with the appellate court because expert testimony may be based on data presented to the expert ' "outside of court and other than by his own perception." ' (84 Ill. 2d 186, 193, quoting Fed. R. Evid. 703, Advisory Committee Note.) The fact that the data was obtained from Boone is relevant only to the weight it should be given, a jury decision, and not to its admissibility. Therefore, the appellate court correctly decided that the expert testimony was properly admitted."

Thus, it is clear the source of the information is relevant only to the question of the weight to be given the evidence and does not affect the admissibility of Dr. Monteleone's opinion.

 The last issue we need address, in the event defendant is again found guilty, is the permissibility of the imposition of an extended-term sentence. The court found defendant eligible for such a sentence, pursuant to the provisions of section 5—5—3.2(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(c)), which authorizes an extended-term sentence for "any offender who was convicted of aggravated criminal sexual assault where the victim was under 18 years of age at the time of the commission of the offense." Defendant believes this is improper. He observes that an element of the offense with which he was convicted is that the victim is under 13 years of age. (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(b)(1).)

He maintains that the extended-term provision thus results in an impermissible double enhancement in this case.

██ Generally, a factor implicit in the offense for which the defendant has been convicted cannot be used as an aggravating factor in sentencing for that offense, absent a clear legislative intent to accomplish the result. (*People v. Ferguson* (1989), 132 Ill. 2d 86, 97, 547 N.E.2d 429, 433; *Fitzsimmons v. Norgle* (1984), 104 Ill. 2d 369, 374, 472 N.E.2d 802, 805.) In determining whether the legislature intended a double enhancement, the courts must look to the text of the statute itself as the best indicator of legislative intent. *Ferguson*, 132 Ill. 2d at 97, 547 N.E.2d at 434.

*Ferguson* involved a number of consolidated appeals addressing application of what is now section 5—5—3.2(b)(4)(i) of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(b)(4)(i)), which authorizes imposition of an extended-term sentence upon a defendant who is convicted of committing a felony against a person under the age of 12, to cases involving either aggravated criminal sexual abuse or aggravated criminal sexual assault in which an element of the offense is the fact that the victim is under age 13. (Ill. Rev. Stat. 1989, ch. 38, pars. 12—16(c)(1)(i), 12—14(b)(1).) The court found this section ambiguous and, relying on the doctrine resolving penal statutes in favor of defendant, the court held the section created an impermissible double enhancement. *Ferguson*, 132 Ill. 2d at 97-98, 547 N.E.2d at 434.

██ However, the court in explaining its decision stated:

"This conclusion is supported by the fact that section 5—5—3.2 was subsequently amended to provide that an extended-term sentence may be imposed upon any offender who was at least 17 years old on the date the crime was committed and who was convicted of aggravated criminal sexual assault against a victim who was under 18 years of age at the time of the commission of the offense. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(c).) Although the State argues that this amendment simply clarifies the legislature's intent to apply harsher penalties in cases where the assaults involve children, we regard it as an example of a clear expression of legislative intent to permit a double enhancement of the penalty, an expression that we find to be lacking in section 5—5—3.2(b)(3)(i)." *Ferguson*, 132 Ill. 2d at 98-99, 547 N.E.2d at 434.

While section 5—5—3.2(c) of the Unified Code of Corrections has undergone some minor amendments since *Ferguson* (see Pub. Act 85—1433, §5, eff. Jan. 11, 1989 (Ill. Rev. Stat., 1988 Supp., ch. 38,

par. 1005—5—3.2(c))), they do not affect this analysis. Thus, *Ferguson* resolves the question, and the enhancement is permissible.

Therefore, for the reasons mentioned above, it is necessary that defendant's conviction and sentence be reversed and the matter remanded for further proceedings.

Reversed and remanded with directions.

KNECHT, P.J., and GREEN, J., concur.