THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CARL MOSS, Defendant-Appellant.

First District (1st Division) No. 1—91—2371

Opinion filed June 28, 1993.—Rehearing denied March 31, 1994.

Michael J. Pelletier and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, Kathleen Van Kampen, and Kevin J. Golden, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial, defendant, Carl Moss, was convicted of two counts of aggravated criminal sexual assault and three counts of aggravated criminal sexual abuse, and sentenced to an extended prison term of 60 years. On appeal, defendant contends that: (1) the trial court erred in admitting hearsay statements at trial pursuant to

section 115—10 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 115—10); (2) he was prejudiced by the prosecutor's comments during rebuttal closing argument; and (3) the trial court erred in relying on an aggravating factor in sentencing him to an extended term of imprisonment. For the following reasons, we affirm the judgment of the trial court.

The following facts are relevant to this appeal. Prior to trial, the State filed a motion to present hearsay evidence pursuant to section 115—10 of the Code of Criminal Procedure. (Ill. Rev. Stat. 1989, ch. 38, par. 115—10.) The motion informed defendant of the State's intent to offer out-of-court statements of complainant, J.Z., made to Ula Jankiewicz, J.Z.'s best friend; Dr. Sharon Ahart, the physician who examined J.Z. following the incident; and Iza Z., J.Z.'s mother. At a pretrial hearing, the State indicated that these three witnesses would testify at trial as to what J.Z. told them regarding defendant's actions toward her. Defense counsel argued that the State's witnesses were required to testify at the hearing in order for the court to determine the time, content and circumstances of J.Z.'s statements. The trial court disagreed with defense counsel's contention and instructed the prosecutor to explain in detail what J.Z. said to each witness. After the prosecutor detailed the content of the testimony of the three witnesses, the trial court granted the State's motion.

At trial, Iza Z. testified that she was born in Poland and came to the United States with her husband and J.Z. in 1985. After Iza separated from her husband, she moved to an apartment in Berwyn, Illinois, with J.Z., who was then eight years old. The lease for her apartment began on August 1, 1989, but Iza and J.Z. began moving things into the apartment during the last few days of July 1989. On July 31, 1989, J.Z. met Ted Moss, defendant's seven-year-old son, and went to his apartment to play with him. Defendant and Ted lived directly across the alley from Iza and J.Z. For the next four days, J.Z. went over to defendant's apartment every day. During that time, defendant called Iza to ask if he could take J.Z. to various places with Ted, including to a soccer game, to the local swimming pool, and to the beach.

On August 4, 1989, Iza had a barbecue party and invited her friends and family. Iza's best friend, Grace Jankiewicz, and Grace's daughter, Ula, came to the party. Later, Grace told Iza that Ula had told Grace that something wrong was going on between J.Z. and defendant. After hearing that, Iza attempted to talk to J.Z. about it, but J.Z. would not talk to Iza.

The next day, Iza tried to talk to J.Z. again. At that time, J.Z. went to Iza's bedroom and barricaded the door on the inside with a

file cabinet. J.Z. then tried to go out the window to defendant's apartment. J.Z. was crying and begging Iza to let her go. On the following day, Iza heard J.Z. tell Ula and Grace that defendant told J.Z. that J.Z. could tell her friend Ula a few things, but that if she told an adult, defendant would go to jail.

On August 7, 1989, Iza took J.Z. to the Berwyn police station and told police officers what she had heard from Ula and Grace about what J.Z. had told them. Iza then took J.Z. to Dr. Sharon Ahart at Mt. Sinai Hospital for an examination. Iza also took J.Z. to a counselor, whom J.Z. was still seeing at the time of trial. Iza testified that she discovered J.Z. "touching her bottom" on two occasions during this time.

On cross-examination, Iza stated she told Officer Domkowski that she learned from Grace that defendant had rubbed cream on J.Z.'s legs. Iza also told Officer Domkowski that defendant took J.Z. to a public pool, pulled his pants down while he was under water, and told J.Z. to look at him. Iza further told the Officer that J.Z. went to defendant's house and took a shower with defendant, and that defendant washed J.Z. After Iza told the officer all of these things she had heard, Officer Domkowski asked J.Z. if these things had happened and J.Z. said "yes." Iza acknowledged that she is presently divorced and that she filed for divorce in February 1989. Iza's husband, Romuald, had been physically violent towards her and had brought guns into the house after Iza filed for an order of protection. After Romuald left, J.Z. would call him up because she wanted to see him, but Romuald did not visit J.Z. very often.

J.Z. testified that she is nine years old and in the fourth grade. J.Z. was eight years old when she moved to Berwyn. She became friends with Ted Moss, who was seven years old and lived next door. J.Z. went over to Ted's house four days in a row. J.Z. met defendant on the first day she went to Ted's house. J.Z. asked defendant where he worked, and defendant told her that he was a doctor. Defendant showed J.Z. a stethoscope, and touched her chest with it. Defendant then placed the stethoscope inside his pants above his penis and told J.Z. to listen.

J.Z. went back to defendant's house the next day, and defendant took J.Z., Ted and another friend of Ted's to Maple Pool in Berwyn. Defendant told J.Z. to go under the water and she did. Defendant then pulled his shorts down and J.Z. saw defendant's penis. She then came back up out of the water. J.Z. did not know where Ted and his friend were during this incident.

The next day defendant took J.Z. and Ted to the beach. When they returned from the beach to defendant's house, defendant and

J.Z. went into defendant's bedroom. Defendant and J.Z. took off their clothes and took a shower. Defendant washed J.Z.'s rear, vagina, and back with his hand. Defendant ran his finger in and out of J.Z.'s vagina. Defendant asked J.Z. to wash his penis with her hand and she did so. After the shower, defendant and J.Z. went into defendant's bedroom and over to the bed. Defendant positioned J.Z. on the bed, lying on her back with her legs apart, and felt her in between her legs. Defendant knelt between her legs and rubbed his penis up and down on her vagina. J.Z. stated that "this stuff came out a little hole," and defendant put it on her belly.

J.Z. stated that defendant did the same thing to her the next day. One time J.Z. licked defendant's penis and it tasted salty. Defendant told J.Z. that what they were doing was a secret and that she was not to tell anyone or he would go to jail. Defendant told J.Z. to put her finger in and out of her vagina to make it bigger so his penis would fit into it. J.Z. stated that she did this. J.Z. further stated that defendant put his tongue on her vagina and into her mouth and told her it was called a "french kiss." On one occasion, defendant put cream around her vaginal area.

One day defendant took J.Z. to a U-Haul trailer rental outlet. Defendant loaded some furniture into the trailer and drove to a man's house. While they were in the car, defendant rubbed J.Z.'s vagina.

J.Z. told her secret to her best friend Ula on the night of the barbecue at J.Z.'s house. After J.Z. told Ula, she told her mother some of what had happened. Later, when J.Z.'s mother tried to talk to J.Z. about the secret, J.Z. went into her mother's bedroom and blocked the door with a file cabinet. J.Z. then tried to go out of the window to defendant's house. J.Z. was afraid to talk to her mother because she thought it was her own fault and that her mother would belt her. J.Z. was embarrassed to tell her mother what happened. After that, Iza took J.Z. to the police station, and then to a female doctor. J.Z. told the doctor only some of the things that defendant did to her.

On cross-examination, J.Z. stated that she remembered going to the police station with her mother and talking to Officer Domkowski, but did not remember what her mother said to the officer. J.Z. stated, "I don't remember what anybody said back then because it's like— like you are asking me questions what I did when I was a baby or something." The parties stipulated to J.Z.'s in-court identification of defendant.

Ula Jankiewicz testified on behalf of the State that she was at a barbecue at J.Z.'s house a couple of summers ago when J.Z. told Ula a secret. At the barbecue, a boy named Jason, who lived next door to

J.Z., told Ula that J.Z. had a secret with defendant, but that she would not tell Jason the secret. Jason asked Ula if she would ask J.Z. about her secret with defendant, and Ula agreed. Ula, Jason and a girl named Monica then asked J.Z. if she had a secret with defendant. J.Z. responded, "Yes, I do," but when they asked her to tell the secret, J.Z. stated, "No, I can't." Later, Ula went for a walk with J.Z. and Ula told J.Z. a secret. After a little while, J.Z. told Ula that defendant had taught her how to kiss and french kiss. J.Z. said that defendant said he was a doctor, and told J.Z. that she had a rash on her private part, and that he rubbed some cream on it. J.Z. also told Ula that when J.Z. and defendant would go driving, she would sit in the front seat, and when no one was around he would rub her private parts. Later that night, when they were inside J.Z.'s house, J.Z. told Ula that she was going to learn about sex, and that defendant would teach her right now. J.Z. also told Ula that she and defendant took showers together. Ula asked J.Z. if she liked it and J.Z. said that she did. After J.Z. told Ula all of this, J.Z. told Ula not to tell anyone or J.Z. would not trust Ula anymore. After that, Ula decided to tell her mother, Grace, and J.Z.'s mother, Iza.

Grace Jankiewicz, Ula's mother, testified that she was at the barbecue at Iza's house on August 4, 1989. That evening, Ula told Grace something that she later told Iza because she was shocked at what Ula had said.

Dr. Sharon Ahart testified that she is the director of the division of pediatric ecology at Mt. Sinai Hospital. Her practice includes examining physically or sexually abused children. On September 21, 1989, Dr. Ahart examined J.Z. First, Dr. Ahart explained the examination to J.Z., and obtained a verbal history from J.Z. Dr. Ahart asked J.Z. if anyone had touched her vagina and J.Z. said "Yes." Dr. Ahart asked her who, and J.Z. said, "A man." Dr. Ahart asked J.Z. the man's name and J.Z. replied, "Carl Moss." J.Z. told Dr. Ahart that defendant lived by their house and that he had touched her with his hands, his mouth and his penis, and that this had happened more than two times.

Dr. Ahart then conducted a genital examination of J.Z. The examination revealed a mild erythema, or redness, of J.Z.'s vaginal area. In addition, the examination revealed internal scarring and adhesions of the hymen. Dr. Ahart noticed that there were only remnants of a hymen left in a certain area. Dr. Ahart stated that her findings during the examination were consistent with trauma, and that the injuries she observed were consistent with the verbal history she obtained from J.Z. Dr. Ahart's diagnosis of J.Z. was sexual abuse. Dr. Ahart noted that J.Z. still had positive feelings towards defen-

dant and that she wanted to continue to see him. Dr. Ahart stated that J.Z.'s desire to continue to see defendant was consistent with sexual abuse because it is not really a violent act. Dr. Ahart conducted her examination approximately six weeks after the alleged molestation.

On cross-examination, Dr. Ahart admitted that the redness may not have been caused by sexual abuse. She further stated that adhesions indicate tissue healing back together and admitted that she could not tell the age of the adhesions that she saw when she examined J.Z., but that they had to be greater than four weeks old. Dr. Ahart stated that it is possible that the redness and adhesions could have been caused by masturbation. Dr. Ahart agreed that Iza told her that she noticed J.Z. masturbating twice, and that J.Z. always talked about sex to other children. On redirect examination, Dr. Ahart stated that J.Z. only started talking about sex and asking questions about sex after the alleged incidents.

Berwyn police lieutenant Bruno Domkowski testified pursuant to subpoena by defense counsel that on August 7, 1989, at around noon, he interviewed Iza at the police station, and that J.Z. was present at that time. Iza related to the officer that defendant had taken a shower with defendant and that defendant had touched J.Z.'s vagina and that J.Z. had touched defendant's penis at that time. Officer Domkowski asked J.Z. if defendant had asked her to put her mouth on his penis and J.Z. answered "no." Officer Domkowski then asked J.Z. if everything Iza had told him was true, and J.Z. replied, "Yes."

On cross-examination, Officer Domkowski stated that J.Z. was not paying attention while he spoke with Iza, but that she was pacing back and forth in the office. J.Z. kept saying, "Let's go. I haven't done anything wrong. Let's leave here." Officer Domkowski stated that his conversation with J.Z. was limited to about four questions and that he never got into detail with J.Z. as to what specifically occurred between her and defendant.

Following the presentation of the evidence and closing arguments, the jury retired to deliberate. Several hours later, when the jury was prepared to deliver its verdict, the court was informed that defendant had fled the courthouse. The State and defense counsel agreed that the jury would read the verdict, but that no mention would be made that defendant was not present. The court then granted the State's motion for a bench bond forfeiture warrant.

The jury found defendant guilty on two counts of aggravated criminal sexual assault and three counts of aggravated criminal sexual abuse. Following a hearing in aggravation and mitigation, the trial court sentenced defendant to an extended term of 60 years'

imprisonment and three years' mandatory supervised release. Defendant's timely appeal followed.

Initially, defendant contends that the trial court erred in admitting the hearsay testimony of Iza Z., Ula Jankiewicz, and Dr. Sharon Ahart pursuant to the hearsay exception for sexual acts on a child under the age of 13. (Ill. Rev. Stat. 1989, ch. 38, par. 115—10.) Defendant argues that the prosecutor's offers of proof as to what these witnesses would testify to at trial do not constitute a "hearing" under the statute. Citing Black's Law Dictionary, defendant argues that "hearing" is defined as "a proceeding at which witnesses testify." Defendant further argues that without witness testimony at the pre-trial hearing, his constitutional right to confrontation under *Idaho v. Wright* (1990), 497 U.S. 805, 111 L. Ed. 2d 638, 110 S. Ct. 3139, has been violated.

Section 115—10 provides in pertinent part:

"(a) In a prosecution for a sexual act perpetrated upon a child under the age of 13, the following evidence shall be admitted as an exception to the hearsay rule:

\* \* \*

(2) testimony of an out of court statement made by such child describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual act perpetrated upon a child.

(b) Such testimony shall only be admitted if:

(1) *The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability*; and

(2) The child either:

(A) Testifies at the proceeding; or

(B) Is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement.

(c) If a statement is admitted pursuant to this Section, the court shall instruct the jury that it is for the jury to determine the weight and credibility to be given the statement and that, in making the determination, it shall consider the age and maturity of the child, the nature of the statement, the circumstances under which the statement was made, and any other relevant factor.

(d) The proponent of the statement shall give the adverse party reasonable notice of his intention to offer the statement and the particulars of the statement." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 38, par. 115—10.)

We note section 115—10 does not define the word "hearing," and we

decline defendant's request to do the job of the legislature and define the term here for purposes of disposition of this issue.[1]

Questions regarding the admissibility of evidence pursuant to section 115—10 lie within the discretion of the trial court, and a reviewing court may overturn a trial court's determination only when the record clearly demonstrates that the court abused its discretion. *People v. Zwart* (1992), 151 Ill. 2d 37, 44, 600 N.E.2d 1169, 1172.

The record in the present case shows that the prosecutor presented offers of proof at the hearing as to the content of the hearsay statements, and as to the time and circumstances of the statements. At the pretrial conference, the prosecutor informed the court the sexual abuse occurred on or around August 1, 1989, through August 4, 1989. The prosecutor stated that Ula would testify that she was at a barbecue at J.Z.'s house on approximately August 4, 1989, when J.Z. told her that she had a secret with the defendant. J.Z. told Ula that defendant had taken his pants down at the pool, that they had taken showers together, that he had touched her private parts, and that this was their secret. The prosecution stated that there was a little boy named Jason that was on the periphery of this conversation, but was not part of the secret.

The prosecution further informed the court that Dr. Ahart would testify that prior to her examination of J.Z. on September 21, 1989, she asked questions of the child to determine her history. Dr. Ahart asked J.Z. if anyone had touched her vagina and J.Z. responded "yes, a man," and then identified that man as the defendant. Dr. Ahart asked J.Z. what had happened to her and that J.Z. said defendant had touched her vagina with his hand, mouth and penis, and that it had happened more than twice.

Finally, the prosecutor informed the court that Iza would testify that J.Z. had not told her any particulars of the abuse, but that when Iza confronted J.Z., J.Z. told her that defendant had said that he would go to jail if J.Z. divulged any information.

█ The record shows the prosecutor's offers of proof as to the witness testimony provided the court with sufficient safeguards of reliability regarding the time, content and circumstances requirement of the statute as required by *Wright*. In *Wright*, the Supreme Court

---

[1]Nevertheless, our research reveals that "hearing" is generally understood to mean a "judicial examination of the issues between the parties, whether of law or of fact." *Matthews v. Weiss* (1958), 15 Ill. App. 2d 530, 532, 146 N.E.2d 809, citing *Anthony v. Gilbrath* (1947), 396 Ill. 125, 128, 71 N.E.2d 84.

held that hearsay testimony is only admissible if it bears adequate "indicia of reliability" met by "a showing of particularized guarantees of trustworthiness" (*Wright*, 497 U.S. at 815, 111 L. Ed. 2d at 651-52, 110 S. Ct. at 3146-47.) The Supreme Court enumerated several factors that indicate reliability including, but not limited to, (1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) use of terminology unexpected of a child of a similar age; and (4) lack of motive to fabricate: "[T]he unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." *Wright*, 497 U.S. at 821-22, 111 L. Ed. 2d at 656, 110 S. Ct. at 3150; see also *People v. Back* (1992), 239 Ill. App. 3d 44, 54, 605 N.E.2d 689; *People v. Coleman* (1990), 205 Ill. App. 3d 567, 581-82, 563 N.E.2d 1010, 1019.

In the present case, the record shows that J.Z. made spontaneous statements about the events which were consistently repeated. J.Z. told Ula about her "secret," and then repeated some of the same details to Dr. Ahart upon her examination. When asked by Officer Domkowski if certain things Iza had told him were true, J.Z. responded "yes." Dr. Ahart testified that J.Z.'s mental state that she wanted to continue to see defendant even after these events occurred was normal for a child who had been abused, because the abuse was not necessarily violent. Further, J.Z. described the events using sexual terminology with which a child of eight would otherwise be unfamiliar. The record reveals an adequate basis upon which the trial court could have determined that the statements were reliable. Therefore, the trial court did not err in admitting the hearsay testimony

Next, defendant contends that during rebuttal closing argument, the prosecutor made several improper comments the effect of which was prejudicial.

In general, courts allow a great deal of latitude to the prosecution during closing and rebuttal arguments. (*People v. Williams* (1991), 147 Ill. 2d 173, 231, 588 N.E.2d 983; *People v. Smith* (1990), 199 Ill. App. 3d 839, 854, 557 N.E.2d 596.) When reviewing allegations of prosecutorial misconduct, the complained-of remarks must be considered in the context of the entire closing arguments of both the State and the defendant. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 175-76, 514 N.E.2d 970.) In closing argument, a prosecutor may comment on the evidence and legitimate inferences arising therefrom, and such comments do not exceed the bounds of proper argument. (*People v. Williams* (1991), 147 Ill. 2d 173, 231, 588 N.E.2d 983.) A defendant may not claim prejudice from comments by the prosecutor when those comments were invited by defendant's

argument. *People v. Richardson* (1988), 123 Ill. 2d 322, 356, 528 N.E.2d 612.

During closing argument in the present case, defense counsel argued to the jury that J.Z. grew up in a violent home environment where her mother was physically abused. Defense counsel stated:

"Now I don't know why she is saying these things about Carl Moss, but there must be something in the recesses of her mind. We don't know if she has ever been abused by anyone before the alleged incident. *** We don't know *** whether her father ever sexually abused her. We will never know from the evidence. *** We don't know what motivates a child to say things like she said."

Defense counsel further argued that children may learn about sexual matters from cable television, other children at school, and from the "different world of today."

In rebuttal, the prosecutor made the following comments:

"She told you the truth. She said these things about Carl Moss because they are true. Carl's lawyers say to you 'Well, we don't know if she was ever abused by someone else.' *** Don't you think if there was ever allegations that little girl's father sexually or physically abused her, they would have made sure you heard that? Do you think they would have just sat there and not asked that question, if they knew that that was the truth?"

At this, defense counsel objected, and the trial court overruled the objection. Following the trial court's ruling, the following colloquy occurred:

"PROSECUTOR: The fact of the matter, Your Honor, is that there is no evidence of those things.

DEFENSE COUNSEL: That's something we would never know that counsel knows that.

THE COURT: Objection sustained.

DEFENSE COUNSEL: Thank you, Your Honor.

PROSECUTOR: No, Judge. Thank you. May I continue?"

Defendant first contends that the above colloquy improperly shifted the focus of attention from the evidence, portraying defense counsel in a bad light. Defendant argues that the prosecutor was aware of mental health records stating that J.Z.'s father had physically abused her and, therefore, it was improper for the prosecutor to tell the jury that there was no such evidence.

In response, the State argues that the prosecutor was merely pointing out that there was no evidentiary basis for defendant's argument. The record discloses that, prior to trial, defendant issued a subpoena to Jean Drescher, J.Z.'s youth counselor, and requested that she provide certain mental health records pertaining to J.Z. from the Fillmore Center for Human Services (Fillmore Center). The

State moved to quash defendant's subpoena on the ground that the records were privileged communication. Following arguments by the parties, the trial court denied the State's motion but noted that the defense had the right to ask for an *in camera* inspection of the records if it chose to do so. Prior to trial, defense counsel made no such request.

During trial, following the testimony of Iza, J.Z., and Ula and Grace Jankiewicz, defense counsel requested an *in camera* inspection of the medical records and the parties had a conference outside the presence of the jury. The trial court asked defense counsel if she intended to use the medical records at trial, and defense counsel responded that the records contained a notation that appeared to state that J.Z. had been physically abused by her father. In response to the court's question, defense counsel admitted that she did not know who had authored the notation. The State indicated that it did not intend to call any witnesses from the Fillmore Center because there was nothing in the records material to the case against defendant. The trial court then asked defense counsel if J.Z. had admitted being physically abused by her father, and defense counsel replied that she had not asked J.Z. that question. Defense counsel further admitted that she failed to ask Iza whether J.Z. had been abused by her father. The trial court concluded that defense counsel's request for *in camera* inspection was untimely because the witnesses had already testified and, therefore, the record "will speak for itself."

■ Under the circumstances, there was no evidence before the court that J.Z. had been abused by her father or that the State knew this fact to be true. The record shows that the prosecutor's comments were invited by defense counsel's comments during closing argument. In addition, the court sustained defense counsel's objection to the prosecutor's comment, which cured any potential prejudice. See *People v. Smallwood* (1991), 224 Ill. App. 3d 393, 586 N.E.2d 636.

Defendant further objects to the following comments of the prosecutor in response to defense counsel's argument that J.Z. may have learned about sex from cable TV:

> "Is there a cable TV that says to a small child when it's instructing on how to have sex with a fifty-year old man, that the taste of the man's penis is 'salty'? *** That's ridiculous and it's just proof of the desperate—of the desperation. And please do not become confused by the desperate defense that's going on in this case."

The trial court sustained defense counsel's objection to the prosecutor's remark. Defendant now argues that the prosecution's use of the terms "desperate" and "desperation" were prejudicial.

The cases relied upon by defendant are distinguishable from the

present case. For example, in *People v. Monroe* (1977), 66 Ill. 2d 317, 362 N.E.2d 295, the prosecutor stated:

" 'That is a preposterous defense. I have never heard of a weaker defense in five years of practicing in criminal law. Do you know why I can't believe it? Because \*\*\* [defense counsel] doesn't believe it himself.' " (*Monroe*, 66 Ill. 2d at 323, 362 N.E.2d at 298.)

The supreme court held that the comments were improper because the assistant State's Attorney expressed his own opinion of defendant's guilt. *Monroe*, 66 Ill. 2d at 324.

The comments made by the prosecutor in the present case do not rise to the level of those prohibited in *Monroe* because the prosecutor did not improperly express her own opinion of the defendant's guilt. Rather, the comments here were proper response to defense counsel's comment that J.Z. could have learned about sex from cable television.

Lastly, defendant objects to the following comments made by the prosecutor on rebuttal:

"They tried to tell you in the beginning, like she was emotionally disturbed. They wanted to plant those ideas in your head. \*\*\* That's name calling from Carl's lawyers. \*\*\* Does it surprise you that they would say things like that about [J.Z.]? Does that seem surprising to you? They have attempted to twist this whole thing around so that [J.Z.] is the bad guy and Carl Moss is some kind of fifty-year old martyr that needs you to protect him from an eight-year old child."

The trial court overruled defense counsel's subsequent objection.

Defendant contends that the above comments shifted the focus of attention from the evidence to the objectives of trial counsel, portrayed defense counsel as using improper and unprofessional methods to free the defendant, and accused defense counsel of resorting to trickery or improper tactics.

Defendant relies on *People v. Emerson* (1983), 97 Ill. 2d 487, 455 N.E.2d 41, which is distinguishable. There, the prosecutor stated in closing argument that defense counsel had laid down a smokescreen "composed of lies and misrepresentations and innuendoes." The prosecutor further stated that all defense attorneys try to "dirty up the victim" to distract the attention of the jury from the defendant's crime. (*Emerson*, 97 Ill. 2d at 497.) The court held that unless based on some evidence, statements made in closing arguments by the prosecution which suggest that defense counsel fabricated a defense theory, attempted to free his client through trickery or deception, or suborned perjury are improper. *Emerson*, 97 Ill. 2d at 497.

In the present case, the prosecutor has not suggested that defense

counsel has fabricated a defense theory or resorted to "character assassination." (*Cf. Monroe*, 66 Ill. 2d at 323.) Rather, the record reflects that the prosecutor properly responded to the arguments made by defense counsel during his closing argument. Defendant's further contention that the cumulative effect of the prosecutor's comments undermined the confidence of the jury is without merit. As there is no reversible error on any individual issue, there is no cumulative error. See *People v. Albanese* (1984), 102 Ill. 2d 54, 82-83, 464 N.E.2d 206.

Finally, defendant contends that the trial court erred in sentencing him to a term of 60 years because the court improperly relied on an element of the offense in sentencing. In reliance on *People v. Macke* (1992), 224 Ill. App. 3d 815, 587 N.E.2d 1113, the State responds initially that defendant has waived this issue for review for failure to object at the sentencing hearing and to file a motion to reduce his sentence.

In *Macke*, the fifth district held that a requirement for a post-sentencing motion to reduce is required, similar to the requirement of a post-trial motion to preserve issues on appeal. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124; *Macke*, 224 Ill. App. 3d at 816.) However, in two subsequent cases, the fourth district declined to follow *Macke*, holding that section 5—8—1(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(c)) does not specifically require a motion to reduce sentence as a precondition to appeal. (*People v. Turner* (1992), 233 Ill. App. 3d 449, 456, 599 N.E.2d 104; *People v. Sims* (1992), 233 Ill. App. 3d 471, 473, 599 N.E.2d 137.) The *Turner* court noted that cases prior to *Macke* have held that post-sentencing motions were not necessary to preserve error as to sentencing issues. (*Turner*, 233 Ill. App. 3d at 455, citing *People v. Hargis* (1983), 118 Ill. App. 3d 1064, 1083, 456 N.E.2d 250, 261; *People v. Scott* (1989), 180 Ill. App. 3d 418, 424, 535 N.E.2d 1113, 1117.) We follow the balance of authority and find that defendant here has not waived this issue for review.

On the merits, the trial court found defendant eligible for an extended sentence pursuant to the provisions of section 5—5—3.2(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(c)), which authorizes an extended-term sentence for "any offender who was convicted of aggravated criminal sexual assault where the victim was under 18 years of age at the time of the commission of the offense." Defendant contends that this is improper because an element of the offense with which he was convicted is that the victim is under 13 years of age. (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(b)(1).) Defendant argues that the extended-term provision thus results in an impermissible double enhancement in this case.

Generally, a factor implicit in the offense for which the defendant has been convicted cannot be used as an aggravating factor in sentencing for that offense, absent a clear legislative intent to accomplish the result. *People v. Ferguson* (1989), 132 Ill. 2d 86, 97, 547 N.E.2d 429, 433.

In *Ferguson*, the supreme court considered a number of consolidated appeals addressing the application of section 5—5—3.2(b)(3)(i) (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(3)(i)), now section 5—5—3.2(4)(i) (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(b)(4)(i)), which authorized imposition of an extended-term sentence upon a defendant who is convicted of committing a felony against a person under the age of 12, to cases involving either aggravated criminal sexual abuse or aggravated criminal sexual assault in which an element of the offense is the fact that the victim is under age 13. (Ill. Rev. Stat. 1989, ch. 38, pars. 12—16(c)(1)(i), 12—14(b)(1).) The court found this section ambiguous because the intent of the legislature was not clearly expressed. Thus, the court held the section created an impermissible double enhancement.

■ In explaining its decision, the court stated that the legislature had expressed its intent clearly in the penalty provided under the amendment to section 5—5—3.2, detailed in subsection (c). The court found that section 5—5—3.2(c) provided a clear expression of legislative intent to permit a double enhancement of the penalty, and that the legislature intended to "apply harsher penalties in cases where the assaults involve children." *Ferguson*, 132 Ill. 2d at 98-99, 547 N.E.2d at 434.

In *People v. Coleman* (1990), 205 Ill. App. 3d 567, 563 N.E.2d 1010, this court permitted an extended sentence under section 5—5—3.2(c), finding that: "*Ferguson* resolves the question, and the enhancement is permissible." (*Coleman*, 205 Ill. App. 3d at 587.) Thus, we find defendant's sentence proper.

For the reasons stated above, we affirm the judgment of the trial court.

Affirmed.

BUCKLEY and O'CONNOR, JJ., concur.