THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
C.H., Defendant-Appellant.

Second District   No. 2—92—1317

Opinion filed December 30, 1993.

Charles E. Petersen, of Presbrey & Amoni, of Aurora, for appellant.

David R. Akemann, State's Attorney, of St. Charles (William L. Browers, Robert J. Biderman, and James C. Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GEIGER delivered the opinion of the court:

After a bench trial in the circuit court of Kane County, defendant, C.H., was convicted of two counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—14(b)(1) (now 720 ILCS 5/12—14(b)(1) (West 1992))) against his son, M.H., who was seven years old at the time of the alleged assaults; one count of aggravated criminal sexual abuse (Ill. Rev. Stat. 1991, ch. 38, par. 12—16(c)(1)(i) (now 720 ILCS 5/12—1(6)(c)(1)(i) (West 1992))) against his son, D.H., who was about seven years old at the time of the alleged abuse; and two counts of public indecency (Ill. Rev. Stat. 1991, ch. 38, par. 11—9(a)(2) (now 720 ILCS 5/11—9(a)(2) (West 1992))) involving several of his young children. The court sentenced defendant to two 10-year terms of imprisonment for the aggravated criminal sexual assault convictions, a six-year term of imprisonment for the aggravated criminal sexual abuse conviction, to be served consecutive to the 10-year terms; and two 364-day terms for the public indecency convictions, to be served concurrently with the six-year term.

Defendant appeals and contends that: (1) he was denied his right to a speedy trial; (2) the trial court erred when it admitted hearsay evidence under a statutory exception to the hearsay rule; (3) the evidence was insufficient to prove him guilty beyond a reasonable doubt; and (4) the sentences were excessive.

### BACKGROUND

In May 1990, defendant lived with his wife, Maria, and their eight children, who ranged in age from 2 years old to 19 years old. Since 1977, the family lived in a large single-family house in Aurora. Defendant had been employed 27 years as an accountant for a large corporation in its downtown Chicago headquarters.

On May 23, 1990, defendant received a letter from the Department of Children and Family Services (DCFS). The letter advised defendant that he was the subject of an investigation by DCFS for alleged child neglect or abuse. On May 24, 1990, defendant called DCFS and learned that DCFS was investigating him for child sex abuse. On May 26, 1990, at his wife's insistence, defendant moved out of the family home.

In May and June 1990, pursuant to the report of child sexual abuse, a DCFS child protection investigator, Mary Heywood, conducted interviews with several of defendant's children. Among these interviews, Heywood interviewed defendant's sons, M.H. and D.H.

On October 16, 1990, defendant was indicted on eight counts. Count I and II charged defendant with aggravated criminal sexual assault against his son, M.H., by twice engaging in anal intercourse with M.H. during the summer of 1989 when M.H. was seven years old. Counts III and IV charged defendant with the aggravated criminal sexual assault of his daughter, J.H., by vaginal and oral penetration of J.H. during early 1990 when J.H. was two years old. Counts V and VI charged defendant with aggravated criminal sexual abuse of his son, D.H., by touching D.H.'s penis and having D.H. touch defendant's penis for purposes of sexual arousal when D.H. was about seven years old. Counts VII and VIII charged defendant with public indecency by masturbating in the presence of several of his children at two different locations in the family home in 1989 and 1990.

At the start of defendant's trial, the State nol-prossed counts III and IV. At the conclusion of the State's case, the trial court granted defendant's motion for a directed finding in favor of defendant as to count VI.

After the trial, the trial judge found defendant guilty of counts I, II, V, VII and VIII. Defendant appeals his convictions on those counts.

### SPEEDY TRIAL

We will first address defendant's contention that he was denied his right to a speedy trial. Defendant asserts that the speedy trial violation occurred when his trial did not begin within 160 days of his demand for a speedy trial as required by the speedy trial statute, which provides, in pertinent part:

> "(b) Every person on bail or recognizance shall be tried by the court having jurisdiction within 160 days from the date defendant demands trial unless delay is occasioned by the

defendant \*\*\*." Ill. Rev. Stat. 1991, ch. 38, par. 103—5(b) (now 725 ILCS 5/103—5(b) (West 1992)).

The record shows that defendant demanded a speedy trial while on bail on January 10, 1992. The trial began 165 days later on June 23, 1992.

After conducting a hearing on the matter, the trial court determined that defendant occasioned part of the delay in his trial and that the delay occasioned by defendant tolled the speedy trial period. The court concluded that 81 of the 165 days between defendant's speedy trial demand and the start of his trial were attributable to defendant because he agreed to an 81-day continuance during that period. The court stated that the agreed continuance tolled the speedy trial period for 81 days and that since only 84 days (165 minus 81) of the speedy trial period had run, there was no speedy trial violation. We agree.

■ An express agreement by a defendant to a continuance on the record constitutes an affirmative act attributable to a defendant which tolls the statutory speedy trial period. (*People v. Reimolds* (1982), 92 Ill. 2d 101, 106.) Here, the record clearly shows that defendant agreed to an 81-day continuance during the speedy trial period. The continuance was from January 10, 1992, until April 1, 1992. *Defendant's agreement to the continuance is shown by a trial court order entered on January 10, 1992, which indicates that the continuance was by agreement.* In addition, a transcript of the January 10, 1992, proceedings indicates that defendant's attorney agreed to the continuance.

Defendant's argument that his apparent agreement to the continuance was not an actual agreement because it was taken out of context is unpersuasive. We must sustain a trial court's determination as to who is responsible for the delay of a trial unless there is a clear showing that the trial court abused its discretion. (*People v. Bowman* (1990), 138 Ill. 2d 131, 137.) Here, the record does not show any abuse of discretion by the trial court. For the above reasons, we hold that defendant was not denied his right to a speedy trial.

## SECTION 115—10 ADMISSIBILITY

Defendant next contends that the trial court erred when it admitted out-of-court statements made by M.H. and D.H. under a statutory exception to the hearsay rule. The statutory exception, section 115—10 of the Code of Criminal Procedure of 1963, provides:

"§115—10. (a) In a prosecution for a sexual act perpetrated upon a child under the age of 13, including but not limited to prosecutions for violations of Sections 12—13 through 12—16 of

the Criminal Code of 1961, the following evidence shall be admitted as an exception to the hearsay rule:

(1) testimony by such child of an out of court statement made by such child that he or she complained of such act to another; and

(2) testimony of an out of court statement made by such child describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual act perpetrated upon a child.

(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child either:

(A) Testified at the proceeding; or

(B) Is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement." Ill. Rev. Stat. 1991, ch. 38, par. 115—10 (now 725 ILCS 5/115—10 (West 1992)).

The trial court conducted extensive hearings to determine the section 115—10 admissibility of out-of-court statements made by M.H., D.H., and others to a number of witnesses. The trial court determined that the testimony of some of the witnesses was admissible and that the testimony of others was not admissible. However, because the State only actually presented at trial the testimony of Mary Heywood with respect to M.H. and D.H., defendant only appeals the admission of that testimony.

Mary Heywood was the DCFS child protection investigator assigned to investigate the reported child sexual abuse by defendant. Heywood received the abuse report on May 17, 1990. As part of her investigation, Heywood interviewed several of defendant's children including M.H. and D.H. At the section 115—10 hearing, Heywood testified, *inter alia*, as to statements made to her by M.H. and D.H. Heywood testified as follows.

Heywood first interviewed M.H. at his school with the school principal present on May 18, 1990. Heywood began the interview, as she begins all interviews with children, by explaining that her job was to help children who are having problems. Heywood asked M.H. whether he was having problems with anyone in his home. M.H. responded that he had some problems with defendant, his father. M.H. told Heywood that he and his younger brother, P.H., observed defendant mas-

turbating on two occasions about two years prior to the interview. In describing what he and P.H. saw, M.H. stated that defendant's "hands were moving up and down on *** his private part *** [until] white stuff came out." Later, M.H. indicated that he knew that another name for "private part" was penis.

On July 12, 1990, Heywood interviewed M.H. a second time. This interview was at the DCFS office in Aurora and Heywood was alone with M.H. At the second interview, M.H. initially recounted the two masturbation incidents he had revealed in the first interview. Heywood testified that M.H. then stated that he had another problem with defendant in the summer of 1989. M.H. stated that the problem occurred after defendant gave a bath to M.H., P.H., and their sisters, twins, aged two. Heywood's testimony continued as follows:

"and then the bath was over and [defendant] dried off all the children.

He then dried [M.H.] off last and had the other children leave the bathroom. At that time he had—[M.H.] says [defendant] bent him over the toilet, spread—and then this is the child's words, spread his butt cheeks apart and 'put his private in my butt hole,' and that is the child's word, and that the child was crying and saying, 'No, Dad, no.'

And [M.H.] said that at that time his dad did stop, and when he took the private part out of the rectal area, that the dad had taken his private and begun moving his own hand up and down on it until, the child's words again, the white stuff came out.

Q. You say the child's words. [M.H.] is saying this?

A. Those are the child's words. He said, 'My dad put his hand up and down on the private part and the white stuff came out again.' "

Heywood further testified that during the second interview M.H. also stated that there was a second incident of anal intercourse between defendant and M.H. a day or two after the first incident. M.H. stated that the second incident occurred in the living room of the family house when he was alone with defendant while all the other children were outside playing and his mother was gone shopping. Heywood testified that M.H. said, "My dad pulled down his pants and he pulled down my shorts and he bent me over the orange chair. He spread my butt cheeks apart and put his private in there about halfway."

Heywood also testified that she interviewed defendant's son, D.H., on June 12, 1990, at the DCFS office in Aurora. D.H., 11 years old at the time of the interview, stated that on about 20 occasions he

had observed defendant, while sitting in his orange chair in the living room of the family house, moving his hands up and down on his penis (the child used the word "wiener") "until the white stuff came out." After the white stuff came out, defendant always wiped himself off with a napkin and pushed the napkin way down into the garbage.

D.H. further stated that on more than one occasion defendant made D.H. touch defendant's penis "sometimes with one hand, sometimes with two hands." On other occasions, defendant touched D.H.'s penis and rubbed it with his hands.

On cross-examination, Heywood stated that she had first interviewed D.H. on May 21, 1990, at D.H.'s school. Heywood admitted that at the first interview, D.H. told her that no one had ever touched his penis and, specifically, that defendant had not touched his penis nor had D.H. touched defendant's penis. Heywood also stated that M.H. had not mentioned anal penetration during his first interview.

On redirect examination, Heywood testified that she asked D.H. why in the first interview he had said no one touched him. D.H. replied that the first interview occurred at his school with a nun present and he was nervous because of that.

After the hearing and arguments, the trial court found that Heywood's testimony was admissible. The trial judge indicated that he made this finding after considering all the factors articulated in *Idaho v. Wright* (1990), 497 U.S. 805, 111 L. Ed. 2d 638, 110 S. Ct. 3139, and *People v. Coleman* (1990), 205 Ill. App. 3d 567. The judge also indicated that in making his finding he only considered the circumstances surrounding the making of the statements. The trial judge stated that "the evidence meets those criteria and I find that there are sufficient safeguards of reliability."

On appeal, defendant argues that the trial court finding was erroneous because Heywood's testimony did not satisfy the safeguards set forth in *Wright*.

Since *Wright* was announced, this court has held that an admissibility determination of the reliability of out-of-court statements under section 115—10 must satisfy the test for particularized guarantees of trustworthiness as found in *Wright*. (*Coleman*, 205 Ill. App. 3d at 583.) This is true whether the child declarant testifies at trial or is unavailable to testify. (*People v. West* (1992), 234 Ill. App. 3d 578, 587.) Coleman elaborated on how to apply *Wright* to section 115—10 determinations of reliability as follows:

> "Accordingly, it is necessary to construe the general language of section 115—10(b)(1) to be in line with the more particular language of *Wright*. Thus, the required finding that the state-

ment provides 'sufficient safeguards of reliability' must be understood to be of a comparable nature with a finding that the circumstances of the statement render the declarant 'particularly worthy of belief' and, in reaching this decision, the court must consider only those circumstances which surround the making of the statement." *Coleman*, 205 Ill. App. 3d at 584.

*Wright* set out a number of factors a court may consider in making a reliability determination. These factors include: spontaneity; consistent repetition; the mental state of the declarant; the use of terminology unexpected of a child of similar age; and lack of a motive to fabricate. (*Wright*, 497 U.S. at 821-22, 111 L. Ed. 2d at 656, 110 S. Ct. at 3150.) The court elaborated on the use of these factors when it stated:

"These factors are, of course, not exclusive, and courts have considerable leeway in their consideration of appropriate factors. We therefore decline to endorse a mechanical test for determining 'particularized guarantees of trustworthiness' under the Clause. Rather, the unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." *Wright*, 497 U.S. at 822, 111 L. Ed. 2d at 656, 110 S. Ct. at 3150.

Recent Illinois cases have considered additional factors. See, *e.g.*, *People v. Jahn* (1993), 246 Ill. App. 3d 689, 701 (listing at least seven additional factors).

When a court has made a section 115—10 determination which takes *Wright* into account, the determination lies within the discretion of the trial court. (*People v. Zwart* (1992), 151 Ill. 2d 37, 44.) A reviewing court may not overturn such a determination unless the record clearly shows that the trial court abused its discretion. *Zwart*, 151 Ill. 2d at 44.

■ Considering the facts of this case in light of these principles, we conclude that the trial court did not err in admitting the out-of-court statements of M.H. and D.H. We first note that the trial court specifically stated that it made its determination after considering the factors articulated in *Wright* and *Coleman* based only on the circumstances surrounding the making of the statements. Thus it is clear that the trial court considered a correct set of factors from the proper point of view (the circumstances surrounding the making of the statements, but not corroborating circumstances).

Defendant contends that the trial court erred in applying the *Wright* factors. Defendant argues that there was no spontaneity in the statements of either M.H. and D.H because the incidents allegedly

occurred some time prior to the statements. Defendant also asserts that the declarants did not consistently repeat their statements as evidenced by inconsistencies between the statements made in the first and second interviews. Finally, defendant maintains that there was nothing unusual about the mental state of either declarant. We will discuss these factors individually.

Spontaneity, the first factor, often is not a controlling factor because a delay in reporting incidents of alleged child sexual abuse is common and does not automatically render a victim's statements inadmissible under section 115—10. (*Zwart*, 151 Ill. 2d at 46.) This is especially true where the defendant is the victim's father. (*People v. Land* (1993), 241 Ill. App. 3d 1066, 1081.) Here, the trial court was aware of the delays with respect to the statements of both M.H. and D.H. regarding their father and could fully assess any impact the delay might have on the credibility of the statements. The trial court could certainly have concluded that it was not surprising that M.H. and D.H. first revealed the sexual abuse in interviews with a DCFS investigator sometime after the events occurred. Accordingly, we cannot say that the trial court abused its discretion in concluding that this factor did not undermine the reliability of the statements in question here.

Consistent repetition is the next *Wright* factor. Defendant argues that the statements alleging sexual abuse made by M.H. and D.H. to Heywood were inconsistent in that the statements made in the first interview were different from those in the second interview. This factor, like spontaneity, is not necessarily controlling because initial denial or reluctance to discuss sexual abuse is common in child victims and does not automatically render a victim's statements inadmissible under section 115—10. (*Zwart*, 151 Ill. 2d at 45-46.) Simply because a child victim does not report all incidents of sexual abuse at the same time does not mean courts may not consider subsequent allegations in making reliability determinations. *Land*, 241 Ill. App. 3d at 1082.

Here, the trial court found that this factor did not undermine the reliability of the statements made by M.H. and D.H. The trial court heard an explanation as to why D.H. was reluctant to disclose sexual touching at his first interview. The statements by M.H. in his second interview revealing anal intercourse by defendant, his father, were not inconsistent with any statements M.H. made in his first interview. Rather, M.H. simply disclosed new allegations of sexual abuse which he had not revealed in the first interview. Applying the above principles to the facts of this case, we cannot say that the trial court

abused its discretion in determining that this factor did not undermine the reliability of the statements in question here.

The next *Wright* factor is the mental state of the declarant. Defendant argues that there was nothing unusual about the mental state of the declarants in this case and therefore this factor does not support admissibility. The record is largely silent as to the mental state of the declarants. There are indications that D.H. was nervous during his first interview. Beyond that, we know little about the mental state of the declarants. On this record, we cannot say the trial court erred in its reliability determinations based on this factor.

There are two *Wright* factors which defendant neglected to mention in his arguments. These factors are: (1) the use of terminology unexpected of a child of similar age, and (2) lack of motive to fabricate. We find that both of these factors support the trial court's reliability determination.

Both M.H. and D.H. used age-appropriate terminology to describe events which would be unexpected of children of their age unless they had in fact observed the events they described. Therefore, the trial court could certainly have weighed this factor in favor of reliability as to both the statements of M.H. and D.H. The description by M.H. of the anal intercourse is particularly striking in this regard. The descriptions of defendant masturbating by both children also supports the trial court's decision. We find these descriptions of events which would be unexpected of children of the ages of M.H. and D.H. particularly compelling because the record indicates that the environment of the interviews where these statements were made was not coercive in any respect. (See *People v. C.H.* (1992), 237 Ill. App. 3d 462, 469.) Nor do we find any evidence of prior interrogation, prompting, or manipulation by adults. (See *Wright*, 497 U.S. at 826-27, 111 L. Ed. 2d at 659-60, 110 S. Ct. at 3152.) Rather, the record shows that Heywood was the first interviewer to talk to M.H. and D.H. about these matters, and that Heywood was an experienced child abuse investigator who did not use leading questions or in any other way suggest to M.H. and D.H. the statements they made. Accordingly, we find that the trial court would not have abused its discretion if it found that the fourth *Wright* factor strongly supported a conclusion that the statements made by M.H. and D.H. to Heywood possessed particularized guarantees of trustworthiness as demanded by *Wright*.

Finally, there is no evidence that either M.H. or D.H. had any motive to lie. The record does not indicate any evidence, other than the alleged abuse itself, why either M.H. or D.H. had any reason to be angry at defendant. Thus, the last *Wright* factor also supports a con-

clusion that the statements made by M.H. and D.H. to Heywood possessed particularized guarantees of trustworthiness.

In summary, contrary to defendant's arguments, the *Wright* factors which apply in this case favor a finding that the statements in question were particularly trustworthy. Consequently, we conclude that the trial court did not abuse its discretion in determining that the out-of-court statements M.H. and D.H. made to Heywood were admissible under section 115—10.

## TRIAL TESTIMONY

At defendant's trial, defendant's son, P.H., testified as follows. P.H. lived with his mother, brothers, and sisters in the family house in Aurora. His date of birth was March 17, 1984. He was eight years old.

On a day around Thanksgiving 1989, P.H. was home alone with defendant. Defendant was seated in his orange chair in the living room of the family house and P.H. was seated in another chair about 12 feet away. Defendant got up and went into the kitchen where he got some napkins. Defendant came back to his chair, unbuckled his pants, and "started to go to the bathroom in the napkins." P.H. saw "white stuff" come out of defendant's penis (P.H. called it his "wiener") and go into the napkins. While defendant was doing this, defendant called P.H. over to the chair that defendant was sitting in. P.H. saw that the white stuff was different than urine. P.H. was only about a foot or two away from the chair defendant was sitting in when this happened and P.H. had an unobstructed view of defendant while this was happening. When defendant was finished, he stuffed the napkins into the garbage. Defendant then told P.H. not to tell anyone what had happened.

On cross-examination, P.H. testified that the incident occurred in the afternoon and he had just come in from playing outside with two friends whom he was able to identify. P.H. stated that, although there was usually many people coming and going in the house, he was alone with defendant on that day because his siblings were outside playing, except for the two-year-old twins who had gone to the store with their mother. At the time of the incident, the shades in the living room were pulled down. P.H. could not remember talking to Mary Heywood, and could not remember telling anyone that he had never seen defendant touch his penis, or that he had made up a story about seeing defendant pee in a napkin.

On redirect examination, P.H. testified that the incident occurred on a day around Thanksgiving when defendant was off work for the

holidays. P.H. also testified that none of the people who had talked to him about this incident told him what to say in court.

Defendant's son, D.H., testified at defendant's trial as follows. He lived with his mother, brothers and sisters in the family home in Aurora. His date of birth was December 16, 1978. He was 13 years old. He remembers when defendant, his father, lived with the family before May 1990. When he was between the ages of about five or six until about the age of nine, D.H. was sometimes home alone with defendant when D.H.'s mother and siblings went to church on Sunday mornings.

D.H. further testified that when he was home alone with defendant on these occasions, defendant would often "wiggle" his penis (D.H. called it his "private") around, and "white stuff" would come out. This sometimes occurred when defendant was seated in his orange chair in the living room of the family house, and sometimes upstairs in the bathroom. When it occurred, defendant would tell D.H. to come and watch. The "white stuff" was different than urine, and after defendant wiggled his penis the white stuff would go into paper towels which defendant disposed of in the garbage. Defendant would tell D.H. "not to tell mom or anybody else."

D.H. testified that he saw defendant do this about 10 or 20 times in the bathroom, while defendant was seated on the toilet and D.H. was standing nearby. Each time lasted about five minutes. D.H. also saw defendant do this about 10 or 20 times while defendant was seated in his orange chair in the living room and D.H. was standing nearby.

D.H. could not remember defendant ever asking D.H. to touch defendant's penis, and could not remember if defendant ever touched D.H.'s penis. D.H. remembered talking to Mary Heywood. D.H. could not remember telling Heywood that D.H. had sometimes touched defendant's penis, or that defendant had sometimes touched D.H.'s penis.

D.H. testified that he was nervous and did not want to testify. He did not want to come to court, but came because he was subpoenaed.

On cross-examination, D.H. testified that he remembered talking to Mary Heywood at his school with a nun present. D.H. then gave the following testimony:

"Q. And at that point in time, you told Mary Heywood that you'd never seen anyone or Dad touch his own private parts, right?

A. I wasn't asked that question.

Q. You didn't make that statement?

A. No."

On redirect examination, D.H. testified that he told Heywood different things in the second interview with her than he had told her in the first interview with her. However, D.H. could not remember specifically what he had told Heywood at the second interview.

Defendant's son, M.H., testified at the trial, although he had surgery the previous day for a leukemia condition. Because he was weak from the effects of chemotherapy, he testified while reclining on a couch.

M.H. testified as follows. He lived with his mother, brothers and sisters in the family home in Aurora. His date of birth was August 28, 1981. He was 10 years old. He had just completed the fifth grade.

In the summer of 1989, before defendant moved out of the house, an incident occurred involving M.H. and defendant. Defendant had given a bath to M.H., his brother P.H., and their two-year-old twin sisters. Defendant told everyone but M.H. to get dressed and go downstairs. After the others left, defendant "pulled down [defendant's] pants and stuck his front private part up my back private part *** in my butt." After defendant did this, he told M.H. to get dressed and "not tell mom."

M.H. then described two incidents where he saw defendant masturbate in the family house ("He just shook his private part and white stuff started to come out"). One incident occurred in an upstairs bedroom, and the other took place in the living room.

M.H. testified that he recalled talking to Mary Heywood on two occasions and telling her about the anal intercourse incident in the bathroom. He could not remember telling Heywood about a second incident of anal penetration by defendant. He stated that when he spoke to Heywood at the second interview, he told her everything that happened between himself and defendant.

On cross-examination, M.H. testified that he only remembered one incident of anal penetration by defendant, the incident in the bathroom.

On redirect examination, M.H. testified that he did not tell anybody about the anal penetration by defendant until his second interview with Heywood because M.H. thought it was "too big of a problem; and I would probably get in trouble." M.H. stated that the first time he talked to Heywood he only told her some of the things that happened, but the second time he talked to Heywood he told her everything that happened between himself and defendant.

Heywood testified at the trial regarding the out-of-court statements made to her by M.H. and D.H. Her testimony was consistent

with her testimony at the section 115—10 hearing. Heywood reiterated that M.H. told her that defendant anally penetrated M.H. on two separate occasions. The first incident occurred in the bathroom after defendant bathed M.H. and three of his siblings in the summer of 1989. The second incident occurred a day or two later in the living room of the family house when M.H. was alone with defendant.

With regard to D.H., Heywood testified that D.H. told her during an interview on June 12, 1990, about numerous incidents where D.H. observed defendant masturbating. These incidents took place over a period of several years and ended when D.H. was about nine years old. Sometimes defendant would ask D.H. to touch defendant's penis. Heywood testified that D.H. told her "[s]ometimes he would use one hand to touch his dad's [penis], and sometimes he would use two hands to do it." Sometimes defendant would touch D.H.'s penis and "rub it a little." This touching ended when D.H. was approximately eight or nine years old.

On cross-examination, Heywood testified that she had first interviewed D.H. at his school in the presence of a nun on May 21, 1990. Heywood then gave the following testimony regarding statements of D.H. at the first interview:

"Q. [D.H.] told you that no one had ever touched his privates in an uncomfortable way?

A. Yes, he did.

Q. And he said that his dad had not done that, is that correct?

A. That's correct.

Q. He also told you that no one had ever wanted him to touch their privates, is that correct?

A. Yes, it is.

Q. Not his dad either, is that correct?

A. That's correct.

Q. He'd never seen anyone or his dad touch their own private, is that correct?

A. Yes."

Heywood further testified that at the second interview D.H. stated that he did not tell her about the touching with defendant at the first interview because he did not understand Heywood's questions at the first interview and was uncomfortable because the first interview took place at D.H.'s school.

On redirect examination, Heywood repeated the reason D.H. gave her for not disclosing the touching at the first interview.

After the State rested, defendant's attorney immediately called Heywood as a defense witness. Heywood testified that she interviewed defendant's son, P.H., twice in May 1990. Heywood stated that during the second interview, P.H. told her he had made up what he had previously told her about seeing defendant peeing in napkins.

On cross-examination, Heywood testified just before telling her he made up what he said, P.H. told her he was afraid to tell her what he had seen because defendant had told him not to tell.

The defense next called defendant's wife, Maria. Maria testified that she had spoken about the abuse allegations with M.H., D.H., and P.H. about twice each during the period between their interviews with Heywood. Maria also acknowledged that many other people had talked to the children about the abuse allegations, although none did so in the period between interviews with Heywood. Maria testified that she never told her children what to say about the abuse allegations.

The defense next called defendant. Defendant introduced into evidence diagrams which he had drawn of the first and second floors of the family house depicting what the layout of the house was when he lived there. Using the diagrams, defendant specifically described the living room and bathroom of the house. Defendant testified that the bathroom door could not be tightly closed because it was warped and could not be closed so that the latch would catch. He also stated that if the door was forced closed, it could not be opened without kicking or banging on it.

Defendant further testified as follows. He was never alone in the house with any of his children in the summer of 1989. He was never alone with M.H. at any one given time in 1989. In the summer of 1989 defendant did give the children baths about once per week. There were times when he bathed M.H., P.H., and the baby twin girls together. Privacy was an "unknown word" in the household because there were always children coming in and out of the house.

Defendant testified that he had good relationships with all of his children, including M.H., D.H., and P.H. Defendant categorically denied engaging in anal intercourse with M.H., or any other sexual contact with him or any of his other children.

The defense next called Dr. Philip Jacobson, a pediatrician, who testified as follows. On June 14, 1990, Dr. Jacobson examined M.H. for evidence of sexual molestation. The exam included a genital and rectal evaluation. The exam revealed no evidence of sexual abuse such as bruises or tears around the anus or a lax tone to the sphincter muscle.

Dr. Jacobson also gave M.H. a physical exam on September 19, 1989. The exam on that date was "routine" and "inspectional" and did not include a rectal exam. Dr. Jacobson did not notice anything unusual about M.H.'s rectal area.

Dr. Jacobson also examined M.H. on January 8, 1990, for a rash on his abdomen. The exam did not include any evaluation of M.H.'s rectal area.

On cross-examination, Dr. Jacobson testified as follows. During the September 19, 1989, exam, he did not look at M.H.'s rectum. During the January 1990 exam, he did not examine M.H.'s rectum. Dr. Jacobson agreed that merely because he did not observe any outward indications of sexual abuse when he examined M.H.'s rectum in June 1990, did not mean there had been no sexual abuse.

In response to a hypothetical question with facts similar to the facts alleged in this case involving anal intercourse, Dr. Jacobson opined that after a period of more than nine months "there would probably be no evidence of [a rectal] tear."

The trial court later posed the same hypothetical to Dr. Jacobson and asked whether there would be degradation in the tone of the sphincter muscle after nine or more months. Dr. Jacobson opined that "the odds are very strong that the sphincter tone would be normal."

### SUFFICIENCY OF THE EVIDENCE

On appeal, defendant next contends that the evidence was insufficient to support any of his convictions. Defendant generally argues that numerous inconsistencies in the testimony of the State's witnesses and a paucity of corroborating evidence require reversal of the convictions.

In Illinois, the reasonable doubt standard governs claims of evidentiary insufficiency in sex-offense cases. (*People v. Schott* (1991), 145 Ill. 2d 188, 202-03; *People v. Wittenmyer* (1992), 151 Ill. 2d 175, 190.) Our supreme court recently stated the reasonable doubt standard as follows:

"When faced with a challenge to the sufficiency of the evidence, the reviewing court applies the reasonable doubt standard as set forth in *People v. Collins* (1985), 106 Ill. 2d 237, 261. This standard, derived from *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789, does not require the court to ' "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." ' (Emphasis in original.) [Citation.] Rather, the relevant inquiry is whether, after viewing the evidence in the light

most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Collins*, 106 Ill. 2d at 261; see also *People v. Pintos* (1989), 133 Ill. 2d 286.) *** The standard gives 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' (*Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789; see *People v. Young* (1989), 128 Ill. 2d 1, 51.) Therefore, this court will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses (*Young*, 128 Ill. 2d at 51), and will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt (*Collins*, 106 Ill. 2d at 261)." *People v. Campbell* (1992), 146 Ill. 2d 363, 374-75.

We will apply these principles to each of the charges for which defendant was convicted.

Count I charged defendant with aggravated criminal sexual assault against M.H. by anally penetrating M.H. in the bathroom of the family home. The trial court heard the testimony of M.H. and the testimony of defendant, and determined that the testimony of M.H. was more credible. The trial court indicated that it found significant parts of defendant's testimony not credible. The trial court also indicated that it took special care in view of M.H.'s physical condition, to not be sympathetic to M.H., but rather to evaluate M.H.'s testimony "as just another witness under somewhat more difficult circumstances." From this appropriate perspective, the trial court found M.H.'s testimony as to anal penetration in the bathroom clear and credible. When this evidence is viewed in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found defendant guilty beyond a reasonable doubt. Defendant's argument that guilt was not proven beyond a reasonable doubt because there was no corroboration does not change our conclusion. The credible testimony of only one witness is sufficient to convict, even though the testimony is contradicted by the accused. (*People v. Novotny* (1968), 41 Ill. 2d 401, 411.)

Count II charged defendant with the aggravated criminal sexual assault of M.H. by anally penetrating M.H. in the living room of the family home. This incident allegedly occurred a day or two after the first anal penetration incident. Here, the trial court found Heywood's testimony more credible than defendant's testimony. Although at trial

M.H. could not remember the second incident, M.H. did remember talking to Heywood and stated that he told her everything that happened between himself and defendant. The trial court was fully aware of the deficiencies in the testimony of M.H. regarding the second incident, but chose to believe Heywood's testimony because M.H. testified that he had told Heywood everything. We do not find the trial court's choice improbable or unsatisfactory. (See *People v. Glass* (1992), 239 Ill. App. 3d 916, 927.) Viewing this evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found defendant guilty beyond a reasonable doubt of count II.

Count V charged defendant with aggravated criminal sexual abuse by touching the penis of his son, D.H., for purposes of sexual arousal. At defendant's trial and at the section 115—10 hearing, Heywood testified that D.H. told her that defendant had touched D.H.'s penis on more than one occasion. Defendant categorically denied this. The trial court found Heywood's testimony more credible than defendant's and convicted defendant.

On appeal, defendant contends that the trial court finding was so improbable or unsatisfactory as to raise a reasonable doubt as the defendant's guilt. In support of his position, defendant makes two arguments: (1) D.H.'s trial testimony denied that anyone ever touched his penis; and (2) the trial court directed a finding in favor of defendant on a companion count (count VI) which charged that defendant had D.H. touch defendant's penis, and convicting on one of these counts but not the other is inconsistent.

We disagree with defendant's characterization of D.H.'s trial testimony. A careful reading of the record shows that D.H. did not testify at trial that no one ever touched him, rather he testified that he could not remember whether anyone, including defendant, had ever touched his penis. The record shows that the trial court carefully scrutinized D.H.'s testimony in determining that Heywood's testimony was credible. The record also shows that the trial court was aware that D.H. had explained to Heywood at his second interview with her why he had previously said that no one touched him. Given this careful evaluation of the testimony by the trial court and the great deference given to the trial court's credibility determinations (*People v. Jones* (1988), 174 Ill. App. 3d 737, 745), we accept the trial court determination. Viewing this evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found defendant guilty of count V beyond a reasonable doubt.

We agree with defendant that the directed finding in favor of defendant on count VI seems inconsistent with the guilty verdict on

count V. This is particularly so given the trial court's statement that Heywood's testimony supported a conclusion that "there was touching of [D.H.] by his father and that [D.H.] touched his father." Nonetheless, this does not change our conclusion that the evidence was sufficient to convict defendant on count V beyond a reasonable doubt.

Counts VII and VIII charged defendant with public indecency by masturbating in two different public places, the living room of the family residence and the bathroom of the family residence. On appeal, defendant does not contest the trial court's determinations that these were public places, and that public indecency was an appropriate charge. Rather, defendant argues that because of inconsistencies in the testimony, the evidence shows that no one observed defendant masturbating. The trial court found credible M.H.'s statements made to Heywood that he had observed defendant masturbating in the bathroom, and D.H.'s testimony that he had observed defendant masturbating in the living room. In addition there is the testimony of P.H. that he observed defendant masturbating. We accept the trial court's finding. Viewing this evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found defendant guilty beyond a reasonable doubt of counts VII and VIII.

In summary, we conclude that the trial court properly applied the reasonable doubt standard to each of the crimes for which defendant was convicted, and that the evidence was sufficient to support each conviction beyond a reasonable doubt. The record shows that the trial court carefully weighed the evidence, giving full cognizance to its infirmities, before making its credibility determinations. It is the responsibility of the trier of fact to make credibility determinations and resolve any conflicts in the testimony. We will not substitute our judgment for that of the fact finder on these matters. Although the evidence here is not of the strongest caliber, we cannot say that the evidence was so unreasonable, improbable, or unsatisfactory as to support a reversal of defendant's convictions. When the evidence in this case is viewed in the light most favorable to the prosecution, a rational trier of fact could have found defendant guilty beyond a reasonable doubt of each crime for which he was convicted.

## SENTENCING

Finally, defendant contends that the trial court abused its discretion by imposing 10-year sentences on the aggravated criminal sexual assault charges and a 6-year sentence on the aggravated criminal sexual abuse charge. Defendant asserts that the sentences were excessive given defendant's age, lack of criminal history, longstanding em-

ployment, and provision for the financial needs of his children through an early retirement plan from his employer.

After a sentencing hearing, before imposing sentences, the trial court indicated that it took the following into account in reaching its sentencing determination: a presentence report; arguments from both sides as to factors in aggravation and mitigation; and a statement made by defendant at the hearing. In addition, the court discussed the specific statutory factors in aggravation and mitigation which it determined were applicable to this case. Among the mitigating factors the court considered and discussed were: defendant's background, including his employment and criminal records; the lack of physical harm defendant's conduct caused to the victims; and defendant's provision for the financial support of his children.

A reviewing court has the power to alter sentences, but should apply this power with considerable caution and circumspection (*People v. Turner* (1993), 156 Ill. 2d 354, 359), giving great deference to the trial court's sentencing decisions (*People v. Streit* (1991), 142 Ill. 2d 13, 18). The standard of review is whether the trial court has abused its discretion in imposing the sentence. (*Streit*, 142 Ill. 2d at 19.) A reviewing court should only find an abuse of discretion if the judgment of the trial court is manifestly unjust or palpably erroneous. *People v. Anderson* (1986), 112 Ill. 2d 39, 46.

A trial court is in the best position to consider all the factors related to sentencing. (*People v. D'Arezzo* (1992), 229 Ill. App. 3d 428, 430.) Hence, a trial court has wide latitude in sentencing a defendant to a term within the statutory range prescribed for the crime if the court does not consider incompetent evidence, improper aggravating factors, or ignore pertinent mitigating factors. *People v. Spencer* (1992), 229 Ill. App. 3d 1098, 1102.

Aggravated criminal sexual assault is a Class X felony (Ill. Rev. Stat. 1991, ch. 38, par. 12—14(d) (now 720 ILCS 5/12—14(d) (West 1992))) punishable by a sentence of not less than six years and not more than 30 years (Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—1(a)(3) (now 730 ILCS 5/5—8—1(a)(3) (West 1992))). Aggravated criminal sexual abuse is a Class 2 felony (Ill. Rev. Stat. 1991, ch. 38, par. 12—16(g) (now 720 ILCS 5/12—16(g) (West 1992))) punishable by a sentence of not less than three years and not more than seven years (Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—1(a)(5) (now 730 ILCS 5/5—8—1(a)(5) (West 1992))).

Here, the trial court sentenced defendant to 10 years for each of the aggravated criminal sexual assault convictions. These sentences are toward the low end of the statutory sentencing range. In addition,

the trial court sentenced defendant to six years for the aggravated criminal sexual abuse conviction. This sentence is within the statutory sentencing range.

Based on this record, we cannot say that the trial court abused its discretion in imposing these sentences. The sentences are certainly within the prescribed statutory range for each crime. The record shows that the trial court carefully considered all pertinent mitigating factors. There is nothing to indicate that the trial court considered incompetent evidence or considered improper aggravating factors. Under these circumstances, the trial court was well within its discretion in imposing these sentences.

Accordingly, we conclude that the trial court did not err in imposing these sentences.

Based on the foregoing, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

BOWMAN and DOYLE, JJ., concur.